James D. Greene, Esq., Nevada Bar No. 2647  *E-filed: July 7, 2011*
**GREENE INFUSO, LLP**
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146
Telephone: (702) 570-6000
Facsimile: (702) 463-8401
E-mail: jgreene@greeneinfusolaw.com

Proposed Attorneys for Debtors-in-Possession

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: NOVEMBER 2005 LAND INVESTORS, LLC, | Bankruptcy No. BK-S-11-20704-MKN |
| | Chapter 11 |
| Debtor. | |
| In re: NLV HOLDING, LLC, | Bankruptcy No. BK-S-11-20707-MKN |
| Debtor. | Chapter 11 |
| In re: BOPH, INC., | Bankruptcy No. BK-S-11-20709-MKN |
| Debtor. | Chapter 11 |
| Affects: <br> ■ All Debtors <br> ☐ Affects the following Debtor(s) | Hearing Date: August 10, 2011 <br> Hearing Time: 9:30 a.m. |

**MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING
SALE PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL
OF THE ASSETS OF THE DEBTORS, (II) APPROVING CERTAIN BID
PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF
NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
(IV) SCHEDULING AN AUCTION AND SALE HEARING**

1

November 2005 Land Investors, L.L.C. ("November 2005"), NLV Holding, L.L.C. ("NLV Holding") and BOPH, Inc. ("BOPH") (collectively, the "Debtors"), as debtors-in-possession, hereby move the Court, pursuant to sections 105, 363, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004(b) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Nevada (the "Local Rules") for entry of an order (the "Sale Procedures Order"):

    a.    approving proposed sale procedures (the "Sale Procedures"), as well as proposed bid protections, in connection with the sale (the "Sale") of substantially all of the assets of November 2005 (the "Property")[1] as set forth in more detail in the Stalking Horse Agreement (as defined below);

    b.    scheduling an auction (the "Auction");

    c.    scheduling a final sale hearing (the "Sale Hearing") in connection with the Sale; and

    d.    approving the form and manner of notice of the Auction and the Sale Hearing, including the form and manner of service of the notice (the "Auction and Hearing Notice") attached hereto as *Exhibit A*.

**BACKGROUND**

1. On July 6, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. An official committee of unsecured creditors has yet to be appointed in these Chapter 11 cases. Further, no trustee or examiner has been requested or appointed in any of these Chapter 11 cases.

---

[1] The Property is fully defined in the Stalking Horse Agreement.

2

**Events Leading to the Debtors' Bankruptcy Filing and the Proposed Sale**

3. November 2005 is a Nevada-based limited liability company formed on October 11, 2005 for the purpose of acquiring, together with DRHI, Inc. ("DRHI"), approximately 2,675 gross acres (1,947 net acres) located in North Las Vegas, Nevada (the "Real Property"), which is part of the Park Highlands real estate development (the "Park Highlands Project"). NLV Holding is the 100% owner of November 2005. BOPH is the 100% owner of NLV Holding.

4. On May 9, 2006, November 2005 and DRHI acquired the Real Property from the United States Bureau of Land Management. At the time, November 2005's sole member was NLV Holding. NLV Holding in turn, was owned by a consortium of four homebuilders (the "Original Owners").

5. November 2005 financed the acquisition of the Real Property with first and second lien secured debt. November 2005's debt was to be repaid over time with proceeds from land sales to the Original Owners at predetermined prices according to a predetermined take down schedule. Concurrently with the acquisition of the Real Property, DRHI and November 2005 entered into a Development Agreement ("Development Agreement") with the City of North Las Vegas. The Development Agreement is recorded against all of the Real Property and is binding on successors and assigns of November 2005 and of DRHI as a covenant running with the land.

6. In order to allocate certain infrastructure costs contemplated by the Development Agreement, November 2005 and DRHI also entered into an Infrastructure Funding Agreement dated March 1, 2006, as subsequently amended ( the "IFA"). Under the terms of the IFA, DRHI would over-fund its proportionate share of costs to construct infrastructure for the Real Property, and November 2005 would be obligated to reimburse to DRHI the balance of any such over-funding. To secure the repayment of any amounts owing to DRHI for over-funding of infrastructure costs under the IFA, November 2005 and DRHI also entered into the Conditional Repayment and Funding Agreement dated May 9, 2006 (the "Refunding Agreement"). The Refunding Agreement was duly recorded in the real property records of Clark County, Nevada prior to the inception or recording of November 2005's first and second lien debt. The

GREENE INFUSO, LLP
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

obligations set forth in the Refunding Agreement also encumber the Real Property as a covenant running with the land.

7. Due to a variety of factors including the global economic recession that began in late 2007, depressed residential housing markets and distress in global credit markets, demand for housing in the Las Vegas market declined dramatically. The negative effects of the foregoing on the Real Property were compounded by November 2005's significant debt load.

8. In 2008, BOH Park Highlands NV, L.P. ("BOH") purchased and was assigned all of DRHI's interests in and to the Real Property, including approximately 400 acres of real property and all rights of DRHI under the Development Agreement, the IFA, the Refunding Agreement and a Letter Agreement dated May 9, 2006.

9. Also in 2008, after securing multiple amendments, waivers, extensions and forbearance concessions from lenders, November 2005 attempted to execute an out-of-court restructuring with its first and second lien lenders. November 2005 failed to achieve unanimous consent from the lender groups with respect to the out-of-court restructuring plan. Unable to support its debt structure, November 2005 filed for Chapter 11 bankruptcy in May 2009 in the United States Bankruptcy Court for the District of Nevada, Case No. 09-17474-MKN (the "2009 Bankruptcy").

10. As part of the 2009 Bankruptcy, November 2005 obtained confirmation of a chapter 11 Plan of Reorganization on November 4, 2009 (the "2009 Plan"). Pursuant to the 2009 Plan, approximately $8 million in new capital (in the form of a converted debtor-in-possession loan) was contributed into November 2005, and NLV Holding became the sole member of the reorganized debtor. In addition, the first and second lien debt on the Real Property was restructured, such that the Real Property was then encumbered by (i) first lien debt of $125 million, and (ii) second lien debt of $55 million.[2]

11. Still laden with a significant debt load and under continued housing market stress, the reorganized November 2005 defaulted on interest payments within four months of emergence

---

[2] The liens securing the first and second lien debt remained subject to the pre-existing encumbrance of $3.2 million owed to BOH as evidenced by the Refunding Agreement.

4

1  from chapter 11. The owners of November 2005 stopped funding infrastructure improvements
2  and service obligations in 2010. As a result, for most of 2010, the Real Property sat idle with no
3  development and no activity.

4  12. In December 2010, BOPH purchased 100% of the equity in NLV Holding (for
5  nominal consideration) with the intention of restructuring November 2005's debt facilities so that
6  the Development Agreement could be amended to implement a new cost sharing agreement to
7  allocate infrastructure costs among all owners within the Park Highlands Project. BOPH is an
8  affiliate of BOH.

9  13. <u>During the period between the 2009 Bankruptcy and July 2011, certain parcels of
10 the Real Property have been sold such that November 2005's current interest in the Real
11 Property is 1,340 gross acres (approximately 1,000 net acres).</u>

12 14. Prior to the Petition Date, the Debtors and their professional advisors diligently
13 explored various out-of-court alternatives. In March 2011, the Debtors retained Odyssey Capital
14 Group, LLC ("<u>Odyssey</u>") to assist with these efforts. Odyssey advised the Debtors that a
15 restructuring (either in court or out-of-court) was not possible in light of (i) the depressed value
16 of the Real Property (as evidenced by a recent appraisal obtained by the Debtors); (ii) the stated
17 opposition to any restructuring by a group of lenders holding approximately 48% of the first lien
18 debt; (iii) the stated threat of such lenders to file an involuntary Chapter 7 petition against
19 November 2005 if an organized sales process was not promptly commenced; and (iv) the
20 absence of any working capital available to the Debtors.

21 15. Following significant investigation, due diligence and negotiation with various
22 parties and lenders, the Debtors in consultation with Odyssey, determined that seeking
23 bankruptcy protection under Chapter 11 of the Bankruptcy Code and selling substantially all of
24 their assets pursuant to the Bankruptcy Code was in the best interests of all parties in-interest. In
25 that regard, the Debtors have retained Odyssey to act as financial advisors to the Debtors to run
26 an organized, robust sales process for the Property. Each of the Debtors has appointed one of
27 Odyssey's principals, Mr. Grant Lyon, to their Board of Directors and elected Mr. Lyon as
28 President and Chief Restructuring Officer. In addition, each the Debtors have elected Mr.

**GREENE INFUSO, LLP**
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

5

Nathan Barber of Odyssey as Treasurer, Secretary, and Assistant Chief Restructuring Officer.[3] Mr. Lyon and Mr. Barber will independently manage these Chapter 11 cases and the sale process.

16. Contemporaneously with the filing of the instant Motion, the Debtors have filed their Motion of the Debtors for an Order Authorizing (I) the Sale of Substantially all of the Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, and (II) the Assumption and Assignment of Executory Contracts and Unexpired Leases (the "Sale Motion").

17. In the weeks leading up to this Chapter 11 filing, Odyssey initiated discussions with BOH ("Purchaser") regarding the possibility of Purchaser acting as the stalking horse bidder for a sale of substantially all of November 2005's assets in Chapter 11 proceedings. The Debtors have negotiated the terms of an asset purchase agreement (the "Stalking Horse Agreement")[4] with Purchaser, pursuant to which Purchaser has agreed to act as a stalking horse bidder for the sale of the Property. The Debtors believe that a sale of the Property to Purchaser, or such other party that is the prevailing bidder at an auction, will provide the best opportunity for maximizing value to the Debtors' creditors. The distribution of the proceeds from the sale contemplated herein will be distributed pursuant to a plan of liquidation to be filed prior to the hearing on the instant Motion.

18. The principal terms of the Stalking Horse Agreement are summarized in the Sale Motion. The Stalking Horse Agreement includes certain protections for Purchaser. In particular, subject to Court approval as part of the Sale Procedures Order, the Debtors will be required to pay to Purchaser a fee (the "Break-Up Fee") in the amount of $300,000 and reimburse Purchaser for its reasonable, actual out-of-pocket expenses incurred in connection with the negotiation, preparation, execution, delivery and attempted performance of the Stalking Horse Agreement up to an aggregate amount of $100,000 (the "Expense Reimbursement") in certain circumstances. Specifically, the Break-Up Fee and the Expense Reimbursement will be payable in the event that

---

[3] Mr. Lyon's and Mr. Barber's continued service in these roles is subject to Court approval of the Debtors' application to employ Odyssey.
[4] A copy of the Stalking Horse Agreement is attached as Exhibit A to the Sale Motion (as defined above).

6

the Property is sold to another party in accordance with the Sale Procedures. In that case, the Break-Up Fee and the Expense Reimbursement will be paid from the proceeds of the sale transaction. In the case of a termination based on the Debtors' material breach of the Stalking Horse Agreement, the Break-Up Fee and the Expense Reimbursement will be due to Purchaser within two business days of the termination. The Break-Up Fee and the Expense Reimbursement will be allowed and paid as an administrative expense claim pursuant to section 503(b)(1) of the Bankruptcy Code.

19. The Stalking Horse Agreement also obligates the Debtors to obtain the entry of a Sale Procedures Order acceptable to Purchaser on or before August 12, 2011, and an order approving the sale acceptable to Purchaser on or before September 30, 2011.

20. The Stalking Horse Agreement provides that Purchaser shall deliver $1,520,000 million as an earnest money deposit (the "Earnest Money"). Of this amount, $1,220,000 shall be deposited with an escrow agent ("Restricted Earnest Money"), and $300,000 shall be deposited into the Debtors' debtor-in-possession account ("Unrestricted Earnest Money"). Purchaser has agreed that the Debtors may use the Unrestricted Earnest Money to satisfy administrative expenses incurred by the Debtors in these cases (subject to Court approval when necessary). In return, the Debtors have agreed to the following (collectively, the "Earnest Money Obligation"): (i) in the event that the Property is sold to any other party, the Debtors will repay the Unrestricted Earnest Money to Purchaser at closing from the sales proceeds and (ii) in the event that the Sale to Purchaser or another Successful Bidder is not approved by the Court on or before September 30, 2011 or the Sale to Purchaser or another Successful Bidder does not close on or before October 30, 2011, (a) the Debtors will repay any unspent portion of the Unrestricted Earnest Money to Purchaser and (b) Purchaser shall be entitled to an allowed administrative expense claim pursuant to section 503(b)(1) of the Bankruptcy Code for any portion of the Unrestricted Earnest Money previously spent by the Debtors.

21. The Debtors believe that entry into the Stalking Horse Agreement for the sale of substantially all of November 2005's assets, or such other agreement that the Debtors enter into with the prevailing bidder at the Auction, represents the best possible outcome for these cases.

Given the current outlook and market circumstances and the lack of available working capital for the Debtors, the Debtors believe that a sale based on the Sale Procedures proposed herein provides the best opportunity for maximizing value for the Debtors' creditors.

### Relief Requested

22. By this Motion, the Debtors seek, pursuant to sections 105, 363, 365 and 503 of the Bankruptcy Code, entry of the Sale Procedures Order:

(a) approving (i) the Debtors' proposed Sale Procedures for marketing the Property, which procedures are attached as ***Annex 1*** to the proposed Sale Procedures Order and the Auction and Hearing Notice;

(b) approving the Break-Up Fee, the Expense Reimbursement and the Earnest Money Obligation;

(c) establishing September 15, 2011 at 5:00 p.m. (Pacific Time) as the deadline for the submission of bids (the "Bid Deadline");

(d) scheduling the Auction, if necessary, no later than September 19, 2011; and

(e) scheduling the Sale Hearing for September 23, 2011 at 9:30 a.m. (Pacific Time) to consider the sale of the Property to Purchaser or such other party that is the successful bidder at the Auction.

*The Proposed Sale Procedures*

23. The Debtors are requesting that the Court approve the Sale Procedures for the sale of the Property.[5] The following is a summary of the Debtors' proposed Sale Procedures.[6]

a. Participation in the bidding process and access to the Debtors' due diligence data room will require (i) an executed confidentiality agreement in form and substance satisfactory to the Debtors; and (ii) a statement demonstrating to the Debtors' satisfaction a *bona fide* interest in purchasing, and the financial ability to purchase, the Property. Each person or entity that delivers such materials to the Debtors on or before the Bid Deadline in form reasonably acceptable to the Debtors is hereinafter referred to as a "Potential Bidder".

b. Any Potential Bidder that desires to make a bid shall deliver copies of its bid by facsimile and email to (a) Grant Lyon, Chief Restructuring Officer of the

---

[5] The proposed form of Sale Procedures Order contains dates proposed by the Debtors. These dates are subject to the availability and approval of the Court and may change.

[6] The summary contained herein is qualified by the actual Sale Procedures attached as ***Annex 1*** to the proposed Sale Procedures Order and the Auction and Hearing Notice, which is attached hereto as ***Exhibit B.*** In the event of any conflict between the summary and the Sale Procedures, the Sale Procedures shall control.

GREENE INFUSO, LLP
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

**GREENE INFUSO, LLP**
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

Debtors (the "CRO"), Odyssey Capital Group, LLC, One Renaissance Square, Two North Central Ave., Suite 720 Phoenix, AZ 85004 (b) counsel to the Debtors, Greene Infuso, LLP, 3030 South Jones Blvd., Suite 101, Las Vegas, NV 89146 (Attn: James D. Greene), (c) counsel to Purchaser, Haynes & Boone, LLP, 201 Main Street, Suite 2200, Fort Worth, Texas 76102 (Attn: Stephen M. Pezanosky).

c. All bids must provide for or include:

(i) an all-cash, non-contingent offer to acquire the Property in the form of the Stalking Horse Agreement, marked to show any proposed amendments and modifications to such agreement (the "Marked Agreement") that is binding and irrevocable until 48 hours after the earlier of (a) the closing of the sale of the Property, (b) the withdrawal of the Property for sale by the Debtors or (c) 30 days after the Sale Hearing;

(ii) a proposed purchase price greater than $15,700,000, which consists of the sum of (a) the aggregate consideration offered by Purchaser pursuant to the Stalking Horse Agreement ($15,200,000); (b) the Break-Up Fee ($300,000); (c) the Expense Reimbursement ($100,000); and (d) an initial bid increment ($100,000);

(iii) a certified check or wire transfer in an amount equal to 5% of the cash purchase price set forth in the Marked Agreement payable to the order of the Debtors (a "Good Faith Deposit")[7] and written evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder (as defined below) (provided, however, that the closing of the Sale shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction as the Debtors may reasonably request; and

(iv) that the bid is not subject to any due diligence, financing condition or other contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to purchase the Property other than as may be included in the Stalking Horse Agreement

24. Bidders that have submitted Qualified Bids (as defined in the Sale Procedures) will be eligible to participate at the Auction described below. At least one business day prior to the Auction, each Potential Bidder that has submitted a Qualified Bid must inform the Debtors

---

[7] To the extent the Debtors' prepetition secured lenders (the "Lenders") wish to make a credit bid, the Lenders will not be required to make a Good Faith Deposit or provide written evidence of available cash.

9

whether it intends to participate in the Auction. The Debtors will promptly thereafter inform in writing each Potential Bidder that has expressed its intent to participate in the Auction of the identity of all other Potential Bidders that may participate in the Auction. If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, they will not hold an Auction, the Stalking Horse Agreement will be the Successful Bid (as defined below) and Purchaser will be named the Successful Bidder.

25. If at least one Qualified Bid other than the Stalking Horse Agreement is received by the Bid Deadline, the Debtors will conduct the Auction for the sale of the Property. The Debtors propose that the Auction take place at 9:30 a.m. (Pacific Time) on September 19, 2011 at the offices of Greene Infuso, LLP, 3030 South Jones Blvd., suite 101, Las Vegas, Nevada 89146, or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders. The bidding shall start at the amount offered in the highest Qualifying Bid, plus $100,000 and will continue in increments of at least $100,000 in cash until the bidding ceases. The Lenders will be entitled to credit bid, dollar for dollar, any portion of their secured claims against the Debtors. The Debtors may alter the Sale Procedures at the Auction if, in their reasonable judgment, such alteration will better promote the goals of the Auction. Immediately prior to the conclusion of the Auction, the CRO will: (a) review each bid made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; (b) determine the highest or best bid for the Property at the Auction (the "Successful Bid"); and (c) notify all Potential Bidders at the Auction, prior to its conclusion, of the name of the maker of the Successful Bid (the "Successful Bidder"). All bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale of the Property and the construction and enforcement of the Stalking Horse Agreement. After determining the Successful Bid, the Debtors may determine, in its reasonable business judgment, which Qualified Bid is the next best bid (the "Next Best Bid").

26. The Debtors may reject at any time before entry of the Order granting the Sale Motion any bid, other than the Stalking Horse Agreement, that, in the Debtors' reasonable judgment, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Sale Procedures or the terms and conditions of the Sale or (c) contrary to the best interests of the Debtors and their estates. Subject to the approval of the Court, the Debtors will sell the Property to the Qualified Bidder that submits the Successful Bid, whether such entity is Purchaser or another Qualified Bidder. The Debtors' presentation to this Court for approval of the selected bid as the Successful Bid does not constitute the Debtors' acceptance of the bid. The Debtors will have accepted a Qualified Bid only when such Qualified Bid has been approved by the Court at the Sale Hearing. If the Successful Bidder does not close the Sale by the date agreed to by the Debtors and the Successful Bidder, then the Debtors shall be authorized, but not required, to close with the party that submitted the Next Best Bid (the "Next Best Bidder"), without a further court order. The Debtors acknowledge that (a) with respect to Purchaser, unless the Stalking Horse Agreement is modified as a result of actions taken by Purchaser at the Auction, the Purchaser has no obligation to serve as the Next Best Bidder and (b) with respect to any Qualified Bidder other than Purchaser, unless the Marked Agreement submitted by such Qualified Bidder pursuant to the Sale Procedures alters the Stalking Horse Agreement or such Marked Agreement is modified as a result of actions taken by such Qualified Bidder at the Auction, such Qualified Bidder shall have no obligation to serve as the Next Best Bidder. The Debtors may consider a Qualified Bidder's willingness to serve as the Next Best Bidder in determining the highest or best bid for the Property at the Auction.

27. Except for Purchaser, Potential Bidders or Qualified Bidders shall not be allowed any breakup, termination or similar fee. Moreover, neither the tendering of a bid nor the determination that a bid is a Qualified Bid shall entitle a Potential Bidder or Qualified Bidder to any breakup, termination or similar fee and all Potential Bidders and Qualified Bidders waive any right to seek a claim for substantial contribution.

28. The Earnest Money deposit made by Purchaser shall be returned to Purchaser in accordance with the terms of the Stalking Horse Agreement, as the same may be modified in

11

favor of the Debtors at the Auction. The Good Faith Deposits of all Potential Bidders shall be held in escrow by the Debtors, but shall not become property of the Debtors' estates. The Good Faith Deposits of all Potential Bidders shall be retained by the Debtors, notwithstanding Court approval of a sale, until 48 hours after the earlier of (a) closing of the Sale or (b) withdrawal of the Property for sale by the Debtors, and (c) 30 days after the Sale Hearing. At the closing of the Sale contemplated by the Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit. Notwithstanding the foregoing, in the event Purchaser is not selected as the Successful Bidder, Purchaser's Good Faith Deposit shall be returnable within 24 hours of the selection of the Successful Bidder.

29. The Debtors believe that the proposed Sale Procedures provide an appropriate framework for selling the Property and will enable the Debtors to review, analyze and compare all bids received to determine which bid is in the best interests of the Debtors' estates and creditors.

### *Proposed Stalking Horse Bid Protections and Earnest Money Obligation*

30. As part of the Sale Procedures Order, the Debtors are also requesting approval of the provisions of the Stalking Horse Agreement regarding the payment of the Break-Up Fee and the Expense Reimbursement, on the terms and conditions set forth in the Stalking Horse Agreement, as well as the Earnest Money Obligation. Purchaser conditioned its willingness to serve as a stalking horse bidder on the inclusion of these provisions in the Stalking Horse Agreement. If approved by this Court, the Debtors would be required to pay Purchaser a $300,000 Break-Up Fee and the Expense Reimbursement under the terms and conditions set forth in the Stalking Horse Agreement. In addition, the Debtors would be required to return the Earnest Money to Purchaser, including the Unrestricted Earnest Money pursuant to the Earnest Money Obligation.

31. The Break-Up Fee, Expense Reimbursement and Earnest Money Obligation were negotiated at arms-length and are reasonable given the size and nature of the Sale. Additionally, the Break-Up Fee and Expense Reimbursement, as part of the Sale Procedures, were necessary to induce Purchaser to enter into the Stalking Horse Agreement, which will maximize the purchase

price that the Debtors will receive at the Auction. As such, the Break-Up Fee and Expense Reimbursement are in the best interests of the Debtors' estates and all parties concerned and should be approved. <u>In re America West Airlines</u>, 166 B.R. 908 (Bankr. D. Ariz. 1994); <u>see also In re National Airlines, Inc.</u>, <u>Order Approving and Authorizing the Debtor to Execute the Commitment Letter to Provide Exit Financing, Including Approval of Break-Up Fee and Expense Deposit Provisions,</u> Case No. 00-19258 (Bankr. D. Nev. Sept. 16, 2002) (approving breakup fee and expense deposit in connection with exit facility as reasonable and necessary and in the best interests of the Debtor, its estate and creditors).

32. By conducting due diligence, participating in negotiations for a potential transaction and entering into the Stalking Horse Agreement, Purchaser has established a bid standard, including a price floor, and initiated a legitimate sales process that should serve as a catalyst for other bidders. As a result, the Debtors are now in a favorable position to solicit competing bids that may be materially higher or otherwise more favorable than Purchaser's bid. In short, Purchaser should be compensated for the risk it is taking and the benefit it is providing to the estate.

33. Regarding the Earnest Money Obligation, the Debtors recognized that obtaining debtor-in-possession financing would be impractical since any DIP lender would require priming liens, which would likely to lead to costly negotiation and potential litigation with the Debtors' pre-petition lenders. Instead, the Debtors negotiated with Purchaser to provide the Debtors with the Unrestricted Earnest Money, which will permit the Debtors to fund the marketing process for the sale of the Property. Since the Debtors have no other source of funds to satisfy administrative expenses, it is entirely reasonable to permit Purchaser to credit the Unrestricted Earnest Money against the purchase price and for the Court to approve the Earnest Money Obligation.

### *Proposed Notice of the Sale Hearing*

34. Pursuant to Bankruptcy Rule 2002(a)(2), the Debtors are required to provide their creditors with 21 days' notice of any sale of estate property. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Auction and the Sale

13

Hearing, and the deadline for filing any objections to the relief requested in the Sale Motion as it relates to the Sale. The Debtors propose that the deadline for objecting to approval of the proposed Sale be set for 4:00 p.m. (Pacific Time) on September 12, 2011 (the "Objection Deadline").

35. Within two business days after entry of the Sale Procedures Order the Debtors will serve the Auction and Hearing Notice by first-class mail, postage prepaid upon the following parties: (a) the Office of the United States Trustee for the District of Nevada; (b) counsel to Wilmington Trust, the agent for the Debtors' prepetition lenders; (c) the Debtors' twenty largest unsecured creditors, as identified in the Debtors' chapter 11 petitions; (d) all parties that are known to claim interests in or liens upon Debtors' assets; (e) all parties to the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (collectively, the "Assumed and Assigned Agreements"); (f) the Texas and Nevada state attorneys general; (g) applicable taxing authorities, including the Clark County Treasurer, the State of Nevada and the Internal Revenue Service; (h) all entities requesting service in these cases; and (i) all other known or potential creditors in these chapter 11 cases. The Auction and Hearing Notice shall indicate that the Sale Motion and the Stalking Horse Agreement can be obtained without charge from counsel for the Debtors. In addition, the Debtors will serve the Sale Motion, including a copy of the Stalking Horse Agreement (without schedules or exhibits), on those persons in categories (a) through (i), above. Further, within two business days after entry of the Sale Procedures Order, or as soon as practicable thereafter, the Debtors will place a publication version of the Auction and Hearing Notice for one day in the Las Vegas Review Journal and the Nevada Legal News.

36. The Auction and Hearing Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Sale Motion once they are set by the Court, and, will therefore, comply with Bankruptcy Rule 2002(c). The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the

14

1 proposed sale of the Property. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

### *The Proposed Notice of the Assumption and Assignment of Executory Contracts and Unexpired Leases*

37. The Debtors, as part of the Sale, intend to assume and assign only one executory contract, the Development Agreement, pursuant to which there are no existing defaults. Any other executory contracts or unexpired defaults will be deemed rejected by operation of the Debtors' forthcoming plan of liquidation.

38. Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Nevada; (b) the Debtors' 20 largest unsecured creditors, as identified in the Debtors' chapter 11 petitions; (c) counsel to Wilmington Trust, the agent for the Debtors' prepetition lenders; (d) all parties that have filed requests for notice under Bankruptcy Rule 2002; and (e) all parties to the Assumed and Assignment Agreements. In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter the Sale Procedures Order granting (i) the relief requested herein, and (ii) such other and further relief to the Debtors as the Court may deem proper.

Dated this 7th day of July, 2011.

GREENE INFUSO, LLP

/s/ James D. Greene
James D. Greene, Esq.,
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146

**GREENE INFUSO, LLP**
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146
(702) 570-6000