Raniero D'Aversa, Jr. (NY State Bar No. RD-9551)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 W. 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
E-mail: rdaversa@orrick.com

Jeffery D. Hermann (CA State Bar No. 90445)
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 629-2020
Facsimile: (213) 612-2499
E-mail: jhermann@orrick.com

SHEA & CARLYON, LTD.
James Patrick Shea, Esq. (Bar No. 000405)
Candace C. Carlyon, Esq. (Bar No. 02666)
701 Bridger Avenue, Suite 850
Las Vegas, NV 89101
Telephone: (702) 471-7432
Facsimile: (702) 471-7432
E-mail: jshea@sheacarlyon.com
       ccarlyon@sheacarlyon.com

*Attorneys for Wilmington Trust, National Association,
as successor to Wilmington Trust FSB,
as Administrative Agent and Collateral Agent*

| | |
|---|---|
| In re: NOVEMBER 2005 LAND INVESTORS, LLC, *et al.* <br><br> Debtors. <br><br> Affects: <br><br> ■ All Debtors <br><br> ☐ Affects the following Debtor(s): | Bankruptcy No. BK-S-11-20704-MKN <br><br> Jointly Administered BK-S-11-20707-MKN; and BK-S-11-20709-MKN <br><br> Chapter 11 <br><br> **OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION TO MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING SALE PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, (II) APPROVING CERTAIN BID PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) SCHEDULE AN AUCTION AND SALE HEARING [DKT. NO. 16]** |

Hearing Date: Aug. 11, 2011
Hearing Time: 10:00 a.m

Wilmington Trust, National Association, in its capacities as administrative agent and collateral agent (in such capacities, the "**First Lien Agent**"), on behalf of itself and the lenders (the "**First Lien Lenders**," together with the First Lien Agent, the "**First Lien Lender Group**") under that certain Amended and Restated Credit Agreement (First Lien) (as amended, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"), dated as of November 19, 2009, and entered into by and among (a) November 2005 Land Investors, LLC (the "**Borrower**", "**November 2005**", or the "**Seller**"), (b) NLV Holding, LLC ("**NLV Holding**"), (c) the First Lien Lenders party thereto from time to time, (d) Wilmington Trust, National Association, in its capacities as Administrative Agent and Collateral Agent, as successor to Credit Suisse AG, Cayman Islands Branch, and (e) Credit Suisse Securities (USA) LLC, as syndication agent, by and through its undersigned counsel, respectfully submits this objection to the *Motion of the Debtors for an Order (I) Approving Sale Procedures for the Sale of Substantially All of the Assets of the Debtors, (II) Approving Certain Bid Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Scheduling an Auction and Sale Hearing* filed by November 2005, NLV Holding, and BOPH, Inc. ("**BOPH**") (collectively, the "**Debtors**") [Dkt. No. 16] (the "**Sale Procedures Motion**") whereby the Debtors propose to sell all of the assets of the Debtors, consisting primarily of approximately 1,340 acres of land (approximately 1,000 net acres) situated within the Park Highlands master-planned community in North Las Vegas, Clark County, Nevada (the "**Property**").

This objection (the "**Objection**") is made and based upon the Points and Authorities filed herewith, the pleadings, papers, and records on file in these cases, and any evidence and argument to be presented at the time of the hearing of the Sale Procedures Motion.[1]

Respectfully submitted this 28th day of July, 2011.

*/s/ Jeffery D. Hermann*
Jeffery D. Hermann (CA State Bar No. 90445)
ORRICK, HERRINGTON & SUTCLIFFE LLP

and

Candace C. Carlyon, Esq.
SHEA & CARLYON, LTD.

*Attorneys for Wilmington Trust, National Association, as successor to Wilmington Trust FSB, as Administrative Agent and Collateral Agent*

---

[1] The First Lien Agent respectfully reserves all of its rights to raise additional arguments relating to the Sale Procedures Motion and the Sale Motion to the extent that additional information becomes known to the First Lien Lender Group after the filing of this Objection.

- 3 -

## I. **PRELIMINARY STATEMENT**

1. This is not the usual case where a debtor, after reaching a consensual arrangement with its secured lenders for the disposition of the collateral of the secured lenders, files for bankruptcy protection and subsequently seeks court approval to sell substantially all of its assets through a Section 363 auction process.

2. Instead, much to the surprise of the First Lien Agent and certain of the members of the First Lien Lender Group,[2] these Debtors appear to have undertaken a unilateral path to reacquire the collateral of the First Lien Lenders at an artificially low price through an affiliate of the Debtors in a Section 363 auction occurring after filing Chapter 11 cases for the Debtors.

3. The First Lien Agent is not necessarily opposed to a sale of the Property and in fact, may credit bid for the Property, and may even seek to challenge the affiliate of the Debtors as the stalking horse bidder and request that the Court instead approve the First Lien Agent to be the stalking horse bidder.[3]

4. However, the First Lien Agent objects to the approval of the following provisions described in the Sale Procedures Motion which appear to be designed solely for the benefit of the Debtors and their affiliated stalking horse bidder, rather than maximizing the value of the Property for the benefit of the creditors of the estates of the Debtors, which should be the primary goal of a sale under Section 363 of the Bankruptcy Code.

5. First, the Debtors allege that the liens securing the first and second lien debt on the Property are subject to a pre-existing encumbrance of $3,230,264.00 ("**$3.2 million**") owed to the proposed purchaser, BOH Park Highlands NV, L.P. (the "**Stalking Horse Bidder**" or "**BOH**"), under the guise of the Refunding Agreement (defined below), and payable from the proceeds of the sale prior to distribution of any such proceeds to the First Lien Lenders. *See* Sale Procedures Motion, p. 4 at n.2. As a result, the Debtors take the position, as reflected in the Stalking Horse

---

[2] The Debtors have apparently been in contact with certain members of the First Lien Lender Group who reportedly expressed their preference for a bankruptcy filing by the Debtors.

[3] In addition, it is anticipated that a superior stalking horse offer may be presented at or prior to the hearing. The First Lien Lender Group reserves all rights in this regard, including the rights of the First Lien Lenders to present a superior stalking horse offer.

Agreement (defined below), that the Stalking Horse Bidder can credit bid the first $3.2 million of the purchase price. *See* Stalking Horse Agreement (attached as Exh. A to Sale Motion) ¶ 3. But this position is entirely without merit. As evidenced by the Refunding Agreement itself, the lien of the First Lien Agent for the benefit of itself and the First Lien Lenders is and remains a first priority lien and the Debtors cannot plausibly argue otherwise unless and until the conditions in the Refunding Agreement with respect to the $3.2 million repayment are satisfied. No such conditions have been satisfied in these cases. Accordingly, the Court should not permit the Stalking Horse Bidder to credit bid the first $3.2 million of the purchase price until the existence and priority of the lien (or in this instance, the lack thereof), which is currently in dispute, is resolved.

6. Second, the Stalking Horse Agreement requires the Stalking Horse Bidder to deliver an earnest money deposit in the amount of $1,520,000. *Id.* ¶ 4. Of that amount, $300,000 is to be deposited into the Debtors' debtor-in-possession account to pay administrative expenses incurred by the Debtors in these cases. *Id.* But that $300,000, constituting monies to be paid towards the purchase price of the Property, would clearly constitute the proceeds of the First Lien Lenders' collateral. The First Lien Lenders have not (and likely will not) consent to the depletion of their cash collateral to pay for the costs of administration in the Chapter 11 cases of the Debtors. Moreover, the Debtors have not sought a Court order authorizing the use of the cash collateral of the First Lien Lenders for the payment of administrative expenses nor have they sought authority to surcharge the First Lien Lenders pursuant to section 506(c) of the Bankruptcy Code. The Debtors cannot simply announce their intention to spend the cash collateral of the First Lien Lenders in order to fund the administration of their cases and then proceed to do so. Neither should they be able to embed such a concept in their request to approve bidding procedures without a separate motion with the showing mandated by the Bankruptcy Code to obtain use of cash collateral.

7. Third, the Stalking Horse Agreement requires the Debtors to pay to the Stalking Horse Bidder a break-up fee in the amount of $300,000 and an expense reimbursement up to $100,000 in the event the property is sold to another party. *See* Stalking Horse Agreement

¶ 8(d)(ii). The Stalking Horse Agreement further provides that the break-up fee and expense reimbursement will be paid from the proceeds of the sale transaction. *Id.* ¶ 8(f). Given that the Stalking Horse Bidder is an affiliate of the Debtor, and the fact that neither the Debtors nor their financial advisors attempted to obtain any competing bidders to act as the stalking horse bidder on potentially more favorable terms, the First Lien Agent believes these fees are unnecessary, unjustified, and not in the best interests of the estates.

8. Finally, the First Lien Agent is concerned that the Debtors and their proposed financial advisors (whose retention application is currently pending before this Court) have apparently failed to conduct any marketing of the Property to date in order to establish whether the terms of the proposed stalking horse bid are the best available terms, instead choosing to focus exclusively on formulating an insider offer to purchase the Property. As a result, the First Lien Agent is concerned that the marketing time before the proposed auction date is insufficient for other potential bidders to get up to speed on the other agreements affecting the Property and is further concerned that the proposed financial advisors of the Debtors will favor the offer of the Stalking Horse Bidder that those very financial advisors structured and promoted, with the result that such financial advisors would not be motivated to work with competing bidders to understand the Property and develop competing bids.[4]

9. Accordingly, for the reasons explained herein, the First Lien Agent respectfully requests that the Court enter an order denying the Sale Procedures Motion, or, in the alternative, approving the Sale Procedures Motion but only to the extent that such order provides that (a) the Stalking Horse Bidder shall not be permitted to credit bid any portion of the purchase price absent a final order of the Court determining the extent, validity and priority of their $3.2 million claim; (b) absent a further appropriate order of the Court, the Debtors are not authorized to use any portion of the earnest money deposit for the payment of administrative expenses incurred by the Debtors in these cases; (c) no break-up fee or expense reimbursement shall be payable to the

---

[4] Contemporaneously with the filing of this Objection, the First Lien Agent is filing an objection to the Debtors' application to retain Odyssey Capital Group, LLC as the Debtors' financial advisor because the First Lien Agent has serious concerns relating to Odyssey's impartiality, disinterestedness, and its ability to fairly market the Property to competing bidders.

1  Stalking Horse Bidder; and (d) providing for a much longer marketing period for the Property
2  after retention by the Debtors of a neutral, disinterested and independent broker or financial
3  advisor to conduct such marketing efforts.

## II. BACKGROUND

### A. The Debtors' Chapter 11 Cases, the Sale Procedures Motion, and the Sale Motion

10. On July 6, 2011 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue in the possession of their assets and in the management and operation of their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

11. On July 7, 2011, the Debtors filed the Sale Procedures Motion and a Motion to Authorize and Approve (I) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (II) the Assumption and/or Assignment of Certain Executory Contracts; and (III) Establishing Related Cure Amounts [Dkt. No. 18] (the "**Sale Motion**").

12. Pursuant to the Sale Procedures Motion and the Sale Motion, the Debtors propose to sell all of the assets of the Debtors, consisting primarily of approximately 1,340 acres of land (approximately 1,000 net acres) situated within the Park Highlands master-planned community in North Las Vegas, Clark County, Nevada, upon which the First Lien Agent and Second Lien Agent (defined below) each have a secured lien, to the Stalking Horse Bidder or such other party that is the successful bidder following an auction of the Property.

13. As part of the proposed sale process, the Debtors have entered into an asset purchase agreement with the Stalking Horse Bidder (the "**Stalking Horse Agreement**"). *See* Exh. A to Sale Motion.

14. The Stalking Horse Agreement provides, among other things, as follows:

    a. <u>Purchase Price</u>: $15,200,000 in good and current funds, provided, however, that $3,230,264 of that amount may be satisfied by the Stalking Horse Bidder by virtue of a credit bid pursuant to Section 363(k) of the Bankruptcy Code of amounts owing from November 2005 to the Stalking

Horse Bidder under the terms of that certain Conditional Repayment and Funding Agreement dated May 9, 2006, which debt is secured by a senior encumbrance on the Property. *See* Stalking Horse Agreement ¶ 3.

b. <u>Earnest Money Deposit</u>: Within three (3) business days after the entry by the Bankruptcy Court of the Sale Procedures Order . . . , the Stalking Horse Bidder shall deposit a sum equal to 10% of the Purchase Price as an earnest money deposit . . . in the following manner: the Stalking Horse Bidder shall deliver $300,000 of the Earnest Money to the Seller (the "**Unrestricted Earnest Money**"), and the Seller shall deposit the Unrestricted Earnest Money into its debtor-in-possession account. Subject to any restrictions imposed upon it by the Bankruptcy Court or under the Bankruptcy Code, Seller may, prior to the closing or termination of the Stalking Horse Agreement, use the Unrestricted Earnest Money to pay the administrative expenses incurred in the Bankruptcy Case . . . . *See* Stalking Horse Agreement ¶ 4.

c. <u>Break-Up Fee and Expense Reimbursement</u>: . . . payment of a break-up fee equal to $300,000 . . ., and reimbursement to the Stalking Horse Bidder of its reasonable fees and expenses incurred in connection with this transaction not to exceed $100,000 . . . [as] allowed administrative claims under Section 503 of the Bankruptcy Code and shall be payable to the Stalking Horse Bidder upon the closing of a transaction for the sale or transfer of the Property to any person or entity other than the Stalking Horse Bidder . . . . *See* Stalking Horse Agreement ¶¶ 8(d)(ii) and 8(f).

**B. <u>The First and Second Liens on the Property</u>**

15. As of the Petition Date, the Debtors are indebted to the First Lien Lenders in the aggregate principal amount of $123,488,120.30 pursuant to the First Lien Credit Agreement. Interest, late fees, and other charges and expenses have accrued prior to and were unpaid as of the Petition Date and will continue to accrue on and after the Petition Date in accordance with the

1  First Lien Credit Agreement.  As security for their obligations to the First Lien Lenders under the
2  First Lien Credit Agreement, the Debtors granted a first priority security interest to the First Lien
3  Agent in the Property for the benefit of the First Lien Lenders.  The security interest was
4  perfected by the filing of the First Lien Deed of Trust, Security Agreement, Assignment of Rents
5  and Leases and Fixture Filing, as amended.

6        16.    As of the Petition Date, the Debtors are also indebted to the holders of loans in the
7  aggregate principal amount of $55,438,520.56 outstanding (the "**Second Lien Lenders**")
8  pursuant to that certain Amended and Restated Credit Agreement (Second Lien) (as amended,
9  supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**"),
10  dated as of November 19, 2009, and entered into by and among (a) November 2005, (b) NLV
11  Holding, (c) the Second Lien Lenders party thereto from time to time, (d) Wilmington Trust,
12  National Association, in its capacities as Administrative Agent and Collateral Agent, as successor
13  to Credit Suisse AG, Cayman Islands Branch (the "**Second Lien Agent**"), and (e) Credit Suisse
14  Securities (USA) LLC, as syndication agent.  Interest, late fees, and other charges and expenses
15  have accrued prior to and were unpaid as of the Petition Date and will continue to accrue on and
16  after the Petition Date in accordance with the Second Lien Credit Agreement.  As security for
17  their obligations to the Second Lien Lenders under the Second Lien Credit Agreement, the
18  Debtors granted a second priority security interest for the benefit of the Second Lien Agent in the
19  Property.  The security interest was perfected by the filing of the Second Lien Deed of Trust,
20  Security Agreement, Assignment of Rents and Leases and Fixture Filing, as amended.

21  **III. OBJECTION**

22        The Court cannot approve the Sale Procedures Motion, as currently proposed by the
23  Debtors, for the following reasons:

24      **A. The Stalking Horse Bidder Is Not Entitled To Credit Bid Any Portion of the Purchase Price**

26        17.    The Debtors allege that the liens securing the first and second lien debt on the
27  Property are subject to a pre-existing encumbrance of $3.2 million owed to BOH (*i.e.*, the

Stalking Horse Bidder) pursuant to the terms of the Refunding Agreement,[5] and payable from the proceeds of the sale prior to the distribution of any such proceeds to the First Lien Lenders. *See* Sale Procedures Motion ¶ 6 and p. 4 at n. 2.

18. As a result, the Debtors take the position (albeit wrongly), that, pursuant to section 363(k) of the Bankruptcy Code, the Stalking Horse Bidder can credit bid the first $3.2 million of the purchase price. *See* Stalking Horse Agreement ¶ 3.

19. This position, however, is contrary to the language of the Refunding Agreement and, as such, is completely without merit. In addition, as a general rule, when the validity of a lien is in dispute, the holder of such lien may not credit bid its lien. 11 U.S.C. § 363(k). S*ee also Nat'l Bank of Commerce of El Dorado v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996).

20. Specifically, the Refunding Agreement provides as follows: (BOH is the "Builder" in the following excerpt – and also the Stalking Horse Bidder herein) :

> "**If** any lender or it agents, representatives or Affiliates (each, a "Lender Party") exercises remedies in connection with and pursuant to the terms of the [First Lien Credit Agreement and the other agreements contemplated thereby], and the exercise of such remedies results in a transfer of title to all or any portion of the [Property] (each, a "Transferred Parcel"), whether by foreclosure, deed-in-lieu of foreclosure, or otherwise (collectively, a "Foreclosure"), **then** the Lender Party or other successor (a "Successor") that acquires ownership of the Transferred Parcel shall be obligated … to elect either:
>
> (a) to fully assume in writing the obligations of [November 2005 under certain agreements with Builder] …. ; or
>
> (b) not to assume the obligations of [November 2005 under such agreements] (a "Buyout Election"), in which case the Successor shall pay to Builder … an aggregate amount equal to the Buyout Payment…; provided that in the event of a partial Foreclosure or in the case of multiple Successors, [November 2005] and each Successor shall be severally obligated only for a proportionate amount of the Buyout Payment based on its Partial Share [determined based on the developable acres held by November 2005 and any Successor after the Foreclosure] (*emphasis added*)."

---

[5] The "**Refunding Agreement**" refers to that certain Conditional Repayment and Funding Agreement dated as of May 9, 2006 among Summerset Development Services, L.L.C., November 2005, AWH North, LLC, Standard Pacific of Las Vegas, Inc., McCormick North, L.L.C., Olympia NLV Associates, L.L.C., NLV Holding, and the Stalking Horse Bidder (in the role of "**Builder**" therein) as permitted assignee of DRHI, Inc. (as amended from time to time). The Refunding Agreement was entered into and filed against the Property in the land records in Clark County, Nevada.

1  Refunding Agreement § 1.

2      21.    Based on the above excerpt, the Debtors assert that the "Buyout Payment" referred to therein is $3.2 million and that it constitutes an encumbrance payable from the proceeds of the sale prior to distributing any such proceeds to the First Lien Lenders. *See* Sale Procedures Motion, p. 4 at n.2. But the Debtors are misreading the Refunding Agreement. As a result of the if/then construct of the above provision, in order for the Buyout Payment to become due, the First Lien Lenders (or their agents, representatives or Affiliates) must be exercising remedies under the First Lien Credit Agreement or the other agreements contemplated thereby. None of the First Lien Lenders, the First Lien Agent or any other person or entity have exercised any such remedies in the Debtors' bankruptcy cases or otherwise.[6] The bankruptcy itself and the sale of the Property proposed in the Debtors' bankruptcy cases are completely voluntary on the part of November 2005. Absent an exercise of remedies by the First Lien Lenders (or such others), there is no election to be made by the buyer and no Buyout Payment can or will become due.[7]

    22.    Even if the Court were to find that the Buyout Payment had become due, the fact that the Refunding Agreement is filed against the Property in the real property records does not in and of itself cause the Buyout Payment to be transformed into a lien with priority over amounts due to the First Lien Lenders. The lien of the First Lien Agent for the benefit of itself and the First Lien Lenders is and remains a first priority lien, and the Debtors could not conceivably argue otherwise unless and until the conditions to the Buyout Payment are satisfied. Such conditions are not satisfied here.

    23.    The Stalking Horse Agreement purports to allow the Stalking Horse Bidder (which, as noted above, is defined as the "Builder" in the above-excerpt from the Refunding Agreement) to credit bid $3.2 million of amounts owing <u>from Seller</u> to the Stalking Horse Bidder

---

[6] A credit bid on behalf of the First Lien Lenders, if one were to occur, would not constitute an exercise of such remedies.

[7] The Refunding Agreement also provides that, if a Buyout Payment is triggered but only a portion of the Property is sold or otherwise transferred, the amount of the Buyout Payment will be determined on a pro rata basis. This provision is inapplicable to the facts of this case, both because the Buyout Payment obligation has not been triggered, and because the Debtors are seeking to sell the entire Property.

- 11 -

under the Refunding Agreement, however, the reality is that the Seller owes <u>nothing</u> under the Refunding Agreement, and therefore, the credit bid provision is impermissible.[8]

24.     Accordingly, the Court should not approve the provision in the Debtors' proposed Sale Procedures Order authorizing the Stalking Horse Bidder to credit bid, and by implication, requiring the First Lien Agent to cash bid the $3.2 million before commencing any credit bid.[9]

### B. The Debtors Cannot Surcharge the Secured Lenders' Collateral To Pay the Debtors' Administrative Expenses

25.     As a general rule, absent an express agreement to the contrary, the expenses associated with administrating a bankruptcy estate are not chargeable to a secured creditor's collateral, but must be borne out of the unencumbered assets of the estate.  4 COLLIER ON BANKRUPTCY ¶ 506.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  An exception to this general rule is contained in section 506(c) of the Bankruptcy Code, which permits a debtor-in-possession to recover administrative expenses from a secured creditor's collateral if the following conditions are satisfied:  (i) the expenses are "reasonable" and "necessary" to preserve or dispose of the collateral, and (ii) the incurrence of the expenses confers a "benefit" to the secured creditor.  11 U.S.C. § 506(c).  *See also Compton Impressions, Ltd. v. Queen City Bank, N.A. (In re Compton Impressions, Ltd.)*, 217 F.3d 1256, 1260-61 (9th Cir. 2000).  In addition, the

---

[8] The First Lien Agent also entered into a side letter with the Builder at the time of the Refunding Agreement pursuant to which, among other things, the Builder acknowledged that its rights and interests in the Infrastructure Agreement, which is the agreement that forms the basis for calculating the Buyout Payment, are subordinate to the liens securing the obligations of November 2005 under the First Lien Credit Agreement.  The side letter further provides that in a circumstance where November 2005 rejects the Infrastructure Agreement or the Development Agreement with the City of North Las Vegas, and the First Lien Agent or its designee acquires title to the Property but wants to assume those agreements, the Builder will, at the request of the First Lien Agent or its designee, enter into new agreements in replacement of, and on substantially similar terms as, the Infrastructure Agreement and the Development Agreement in favor of such persons.  None of the provisions in the side letter support the argument that the $3.2 million is due, or if due, is a charge against the Property prior to the lien of the First Lien Agent.

[9] If the parties are unable to resolve these issues consensually, the First Lien Agent believes that the issue will need to be resolved by adversary proceeding which raises the question of whether the sale can proceed before final judgment is reached in the adversary proceeding, and if the sale is to proceed, whether the Stalking Horse Bidder should have the right to credit bid and whether the First Lien Agent would be required to cash bid the first $3.2 million before credit bidding.  Obviously, the First Lien Agent believes that the Stalking Horse Bidder should not be able to credit bid the disputed lien claim and that the First Lien Agent should not be required to cash bid, consistent with the authority cited herein.

expenses may be recoverable where the secured creditor expressly or impliedly consented to the incurrence of the expense, or caused the expense. *Id.* at 1261-62.

26. In the sale context, courts apply the first requirement – that the expense is "reasonable" and "necessary" – by comparing the expenses to be surcharged to the expenses that the secured creditor would have incurred through foreclosure and disposal of the property. *In re Compton Impressions,* 217 F.3d 1260-61 (finding surcharge not reasonable where costs to be surcharged would not have been incurred if secured creditors had foreclosed and where secured creditors could have internalized many costs by using in-house resources).

27. To satisfy the second requirement – that the incurrence of the expenses confers a "benefit" to the secured creditor – the party proposing the surcharge "must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral." *Id.* at 1261 (finding expenses to be surcharged did not confer benefit where secured creditor received no more from sale than it would have received in foreclosure).

28. The Debtors have made no attempt to address these requirements and in fact, have failed to satisfy these requirements.

29. As described in the Background section above, pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder is required to deliver a $1,520,000 earnest money deposit towards the purchase price of the Property. *See* Stalking Horse Agreement § 4. Of that amount, the Debtors intend to spend $300,000 to finance the administrative expenses incurred by the Debtors in these cases. *Id.*

30. However, in the absence of a Court order that either authorizes the use of cash collateral or permits a surcharge pursuant to section 506(c) of the Bankruptcy Code, the Debtors cannot simply declare that they are entitled to finance their bankruptcy cases out of a portion of the collateral of the First Lien Lenders.

31. Moreover, the Debtors have failed to show that their administrative expenses are "reasonable" or "necessary" to the First Lien Lenders. As noted above, the Debtors have made no showing whatsoever. They have not provided any details with respect to the expenses they

intend to pay from the collateral of the First Lien Lenders.[10]  Nevertheless, when comparing the expenses to be surcharged (whatever they may be) to the expenses that the First Lien Lenders would have incurred through foreclosure and disposal of the property, it becomes clear that the Debtors cannot meet the "reasonable" or "necessary" requirement.

32.  In addition, the Debtors have failed to establish in "quantifiable terms" that they intend to expend the cash collateral of the First Lien Lenders directly to protect and preserve the collateral.  The reality is the Debtors are simply trying to finance these Chapter 11 cases at the expense of the First Lien Lenders.  Moreover, it is clear to the First Lien Agent that what the Debtors have proposed here is a quick sale of the Property to an affiliate of the Debtors at a below-market price.  Any expenses associated with such unilateral maneuvering cannot be viewed as having been incurred to protect and preserve the collateral of the First Lien Lenders.  Accordingly, the Court should not sanction that result.

### C. The Break-Up Fee and Expense Reimbursement Payable to the Stalking Horse Bidder Is Unjustified, Provides No Benefit to the Estate, and Should Be Eliminated

33.  At their essence, "[b]reak-up fees are post-sale payments made to bidders who fail to acquire the target sought."  Bruce A. Markell, *The Case Against Breakup Fees in* Bankruptcy, 66 Am. Bankr. L.J. 349, 352 (1992).  Bankruptcy courts have applied a variety of different tests to determine whether to approve a proposed break-up fee.  While older decisions generally deferred to a debtor's business judgment, those decisions are now outdated, and the business judgment rule with respect to break-up fees in bankruptcy has largely been rejected by the more recent bankruptcy court decisions.

34.  Bankruptcy courts considering the propriety of break-up fees now focus not on the debtor's business judgment, but instead on "whether the transaction will further the diverse interests of the debtor, creditors and equity holders, alike."  *In re America West Airlines, Inc.*, 166

---

[10] The First Lien Agent assumes that such expenses include, for example, the costs and fees incurred by the Debtors' professionals.  In fact, the Debtors have filed applications seeking the entry of orders authorizing the employment and retention of Greene Infuso, LLP as the Debtors' counsel, and Odyssey Capital Group, LLC as the Debtors' financial advisors. [Dkt. Nos. 21, 23, respectively] (the "**Retention Applications**").  Contemporaneously with the filing of this Objection, the First Lien Agent is filing objections to each of the Retention Applications.

1  B.R. 908, 912 (Bankr. D. Ariz. 1994) ("The proposed break-up fee must be carefully scrutinized
2  to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties
3  in interest are protected.").

4      35.    In general, courts are focused on the benefit to the estate and have placed the
5  burden on the party seeking a break-up fee to substantiate the merits of that fee. For example, in
6  *Calpine Corporation v. O'Brien Environmental Energy Inc. (In re O'Brien Environmental*
7  *Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999), the Third Circuit stated that "the allowability of
8  break-up fees . . . depends upon the requesting party's ability to show that the fees are actually
9  necessary to preserve the value of the estate."

10      36.    Most recently, courts have applied a multi-factor analysis to determine whether to
11  approve a break-up fee as being in the best interests of the estate.[11] For the reasons discussed
12  below, weighing these factors leads to the conclusion that the break-up fee and expense
13  reimbursement should not be approved.

14      37.    In this case, the two critical factors in the analysis are that the proposed purchaser
15  is an insider of the Debtors and that neither the Debtors nor their financial advisors sought to
16  obtain an offer from a third party to act as the stalking horse bidder.

17      38.    Because of the insider status of the Stalking Horse Bidder, the proposed sale is
18  immediately subject to heightened scrutiny. *See, e.g., In re Hyloft, Inc.*, Case No. 10-13300, 2011
19  WL 2175988, at *7 (Bankr. D. Nev. May 25, 2011) ("While insider status alone is not fatal to

---

[11] The factors to be considered include the following: (i) whether the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (ii) whether the fee hampered, rather than encouraged bidding; (iii) whether the amount of the fee is unreasonable relative to the proposed purchase price; (iv) whether the unsuccessful bidder placed the estate property in a sales configuration mode to attract other bidders to the auction; (v) whether the request for a break-up fee served to attract or retain a potentially successful bid, established a bid standard or minimum for other bidders, or attract additional bidders; (vi) whether the fee requested correlates with the maximization of value to the debtor's estate; (vii) whether the principal secured creditors and the official unsecured creditors committee supported the concession; (viii) whether there were safeguards beneficial to the debtor's estate; and (ix) whether there would be a substantial adverse impact on unsecured creditors from approval of the administrative expense. *See In re O'Brien Evtl. Energy, Inc.*, 181 F.3d at 536; *AgriProcessors, Inc. v. Iowa Quality Beef Supply Network (In re Tama Beef Packing, Inc.)*, 290 B.R. 90, 97-99, (B.A.P. 8th Cir. 2003) (applying the *O'Brien* factors).

dealings between a debtor and an insider, the court must scrutinize these dealings more carefully."); *In re Philadelphia Newspapers, LLC*, No. 09-11204SR, 2009 WL 3242292, at *12 (Bankr. E.D. Pa. Oct. 8, 2009), *rev'd on other grounds*, 418 B.R. 548 (E.D. Pa. 2009) (holding break-up fee for insider bidder was subject to careful scrutiny).

39.     The failure of the Debtors and their financial advisors to even attempt to market the Property prior to the Debtors accepting the insider bid of the Stalking Horse Bidder means that the terms of the stalking horse bid have not been exposed to the marketplace, and the Debtors cannot possibly make any showing that the break-up fee and expense reimbursement have been negotiated at arms-length or constitute the lowest the market could bear.

40.     Under these circumstances, the First Lien Agent can only assume that the proposed payment of a break-up fee and expense reimbursement to the Stalking Horse Bidder is solely for the benefit of the Stalking Horse Bidder as to which the Debtors put up no fight or resistance. Neither the Debtors nor the Stalking Horse Bidder have presented any evidence that the break-up fee and expense reimbursement will enhance bidding at the auction.  In addition, the payments do not create any new or additional value to the estates, rather they merely cover the Debtors' (through an insider) expenses if the Property is sold to another purchaser.

41.     In addition, another factor that courts consider in determining whether to approve a break-up fee is whether the principal secured creditor is supportive of payment of the fee. *See O'Brien*, 181 F.3d at 536.  Simply put, the First Lien Agent does not support payment of a break-up fee or an expense reimbursement to an insider of the Debtors.

42.     Thus, the payment of a break-up fee and expense reimbursement to the Stalking Horse Bidder is unjustified, provides no benefit to the estate, and should be eliminated.

**D. The First Lien Agent is Concerned that the Complexity of the Decision to Purchase the Property and the Purchase Price Require Additional Time for Competing Bidders, Especially Given the Failure to Have Already Marketed the Property**

43.     The First Lien Agent requests that the Court rule that the marketing time for the Property be extended beyond the approximate six week period proposed by the Debtors and the Stalking Horse Bidder given the complexities of the purchase decision faced by other competing

bidders.  The financial advisors to the Debtors were retained by the Debtors in March of this year and labored for four months to proceed to the point of negotiating a purchase of the Property with the Stalking Horse Bidder.  At a minimum, competing bidders should be afforded the same opportunity.

### E. The First Lien Agent is Concerned that the Financial Consultants of the Debtors Were Retained to Facilitate the Repurchase of the Collateral of the First Lien Lenders at a Substantial Discount and Cannot Fairly Represent the Interests of the Creditors of the Estate Given Such A Conflict

44.     Given the failure of the financial consultants to attempt to market the Property and/or to solicit other potential stalking horse bids, the First Lien Agent draws the obvious conclusion that the Debtors' proposed financial consultants were retained to facilitate an insider offer to repurchase the collateral of the First Lien Lenders at a substantial discount.[12]  There is no evidence to the contrary of this logical conclusion presented by the Debtors in their motions before the Court.  Indeed, another further logical conclusion that can be drawn from the facts presented by the Debtors is that BOPH purchased the equity of the Debtors for nominal consideration solely in the desire to gain ownership of the 1,340 gross acres constituting the Property at a discount to market value.  What other conclusion could be drawn?

45.     The First Lien Agent does not suggest that the investment objections of BOPH are insidious or illegal, however, the desire of BOPH to gain ownership of the Property at the lowest possible cost basis is in direct conflict with the goals of the Debtors' estates and the creditors of the estates who obviously desire the best possible price for the Property.  The creditors are entitled to have a fair and impartial process for the sale of the Property.  But that process cannot be implemented by Odyssey, the financial advisor retained by officers of Hillwood Development Company, LLC (a Perot company based in Dallas, Texas), the principal equity sponsor of BOH (the Stalking Horse Bidder) and BOPH (a Debtor) ("**Hillwood**").[13]

---

[12] For the reasons described in the First Lien Agent's objection to the Debtors' application to employ Odyssey Capital Group, LLC as their financial advisor, which is incorporated herein by reference, the First Lien Agent has serious concerns about Odyssey's impartiality, disinterestedness, and ability to fairly market the Property to competing bidders.

[13] In fact, Mr. Fred Balda, the President of Hillwood Communities (a division of Hillwood) signed the Odyssey engagement letter on behalf of November 2005.  The First Lien Agent notes that the Debtors

- 17 -

46. The Debtors obviously are aware of the potential concern that creditors would object if BOPH controlled the sale of the Property to its affiliate. The Debtors have provided but one single prophylactic measure to deal with this concern – none of the representatives of BOPH or its affiliates is *now* serving as an officer of the Debtors – instead, representatives of Odyssey, the financial advisor retained by the Debtors, now serve as the officers of the Debtors. *See* Sale Motion ¶ 16 ("Each of the Debtors has appointed one of Odyssey's principals, Mr. Grant Lyon, to their Board of Directors and elected Mr. Lyon as President and Chief Restructuring Officer. In addition, each of the Debtors have elected Mr. Nathan Barber of Odyssey as Treasurer, Secretary, and Assistant Chief Restructuring Officer."). In the view of the First Lien Agent, the financial advisor retained by Hillwood suffers from the same self-interest and conflict that BOPH and its officers suffer from. The First Lien Lenders deserve to have a neutral, unbiased and disinterested party interact with potential bidders and to otherwise generally run the sale process.

## IV. CONCLUSION

WHEREFORE, the First Lien Agent, on behalf of itself and the First Lien Lenders, respectfully requests that the Court enter an order denying the Sale Procedures Motion, or, in the alternative, approving the Sale Procedures Motion but only to the extent that such order provides that (a) the Stalking Horse Bidder shall not be permitted to credit bid any portion of the purchase price absent a final order of the Court determining the extent, validity and priority of their $3.2 million claim; (b) absent a further appropriate order of the Court, the Debtors are not authorized to use any portion of the earnest money deposit for the payment of administrative expenses incurred by the Debtors in these cases; (c) no break-up fee or expense reimbursement shall be payable to the Stalking Horse Bidder; and (d) providing for a much longer marketing period for the Property after retention by the Debtors of a neutral, disinterested and independent broker or financial advisor to conduct such marketing efforts; and that such order grant such other and further relief as the Court deems just and proper.

---

have failed to provide the Court and the other parties in interest in these cases with a clear description of the relationship between Hillwood, BOPH, and BOH. The Sale Procedures Motion provides no information other than that "BOPH is an affiliate of BOH." Sale Procedures Motion ¶ 5.

1  Respectfully submitted this 28th day of July, 2011.

2              By:

3              */s/ Jeffery D. Hermann*
              Jeffery D. Hermann (CA State Bar No. 90445)
4              ORRICK, HERRINGTON & SUTCLIFFE LLP

5              and

6              Candace C. Carlyon, Esq.
7              SHEA & CARLYON, LTD.

8              *Attorneys for Wilmington Trust, National Association, as successor to Wilmington Trust FSB, as Administrative Agent and Collateral Agent*