James D. Greene, Esq., Nevada Bar No. 2647  
**GREENE INFUSO, LLP**  
3030 South Jones Boulevard, Suite 101  
Las Vegas, Nevada 89146  
Telephone: 702.570.6000  
Facsimile:   702.463.8401  
Email:  jgreene@greeneinfusolaw.com  

*E-filed: August 3, 2011*

Proposed Attorneys for Debtors

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| IN RE:<br><br>NOVEMBER 2005 LAND INVESTORS LLC., et al.<br><br>Debtors<br><br>Affects:<br><br>☒   All Debtors<br><br>☐   Affects the following Debtor(s) | Bankruptcy No. BK-S-11-20704-MKN<br><br>Jointly Administered BK-S-11-20707-MKN, and BK- S-11-20709-MKN<br><br>Chapter 11<br><br>Hearing Date: August 11, 2011<br>Hearing Time: 10:00 A.M. |

**STIPULATION EXTENDING DEADLINE TO FILE OPPOSITION TO SALE PROCEDURES MOTION (DOCKET NO. 16) DEBTORS' REPLY TO (A) OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION TO MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING SALE PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, (II) APPROVING CERTAIN BID PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) SCHEDULE AN AUCTION AND SALE HEARING AND (B) JOINDER OF CREDIT SUISSE LOAN FUNDING LLC**

1

November 2005 Land Investors, L.L.C. ("November 2005"), NLV Holding, L.L.C. ("NLV Holding") and BOPH, Inc. ("BOPH") (collectively, the "Debtors"), as debtors-in-possession, file this Response to Objection Of Wilmington Trust, National Association to Motion of the Debtors for an Order (I) Approving Sale Procedures for the Sale of Substantially All of the Assets of the Debtors, (II) Approving Certain Bid Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Schedule An Auction and Sale Hearing (the "Objection")[1] and respectfully represent as follows:

## I. PRELIMINARY STATEMENT

Through the Sales Procedures Motion, the Debtors have proposed fair, well-balanced procedures for the marketing and sale of the "Park Highlands" Real Property, the sole asset of the Debtors.[2] The development of these procedures and selection of BOH as stalking horse was based in part on the following key facts, all of which are largely ignored by the First Lien Agent in its Objection:

- The Real Property effectively has no value on a going concern basis as a result of onerous and costly development obligations disproportionately imposed upon any owner of the Real Property under a Development Agreement with the City of North Las Vegas (the "Development Agreement"), with no effective means of allocation to other owners that benefit from such development obligations.

- The Development Agreement is filed of record, constitutes a covenant running with the land and cannot be rejected under 11 U.S.C. § 365 or otherwise discharged in the bankruptcy process under 11 U.S.C. § 363.

- In order to efficiently develop the Real Property, certain property boundaries may need adjusting and various wet and dry infrastructure will need installing, but there is no arrangement with neighboring property owners to modify boundaries or contribute towards such infrastructure.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Procedures Motion.

[2] In 2005, November 2005 and other real estate developers acquired approximately 2,675 gross acres (1,947 net acres) in North Las Vegas, Nevada with the intention of developing a planned community known as "Park Highlands" (the "Park Highlands Project"). November 2005 owns a portion of the Park Highlands Project currently consisting of approximately 1,340 gross acres (1,000 net acres) (the "Real Property").

2

- A recent appraisal, which assumed that the Real Property was simply raw land and not burdened by the Development Agreement, valued the Real Property at approximately $19 million.

- BOH is the most likely candidate to purchase the Real Property because BOH owns adjacent land parcels in the Park Highlands project. Any prudent purchaser of the Real Property will require BOH's cooperation and consent to attempt to (i) renegotiate the terms of the Development Agreement with the City of North Las Vegas, (ii) modify boundaries to allow the Real Property to be efficiently developed and (iii) to share in the costs of the wet and dry infrastructure that will benefit both the Real Property and BOH's property.

- BOH's stalking horse offer of $15.2 million is fair and reasonable because it represents 80% of the appraised value of the Real Property *before taking into account the onerous obligations under the Development Agreement.*

- BOH was willing to include in its bid $300,000 to finance the Debtors' Chapter 11 marketing and sale process.

- If the proposed Sales Procedures are not approved, the Debtors will be left without a stalking horse bidder and without a viable path for a sale or reorganization in Chapter 11. In that case, the Debtors likely will be left with no alternative but to convert these cases to Chapter 7, which would lead to an even smaller recovery for creditors months (or years) in the future.

Given these critical facts, the Debtors submit that the terms of BOH's stalking horse offer and the procedures proposed in the Sales Procedure Motion are fair, in the best interests of the Debtors' creditors and should be approved. Nevertheless, although the Debtors strongly believe that the existence of the stalking horse contract will be beneficial, the Debtors are willing to terminate the stalking horse contract if such is the desire of all secured parties.

## II.    JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    BACKGROUND

2. On July 6, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. An official committee of unsecured creditors has yet to be appointed in this jointly-administered Chapter 11 case. Further, no trustee or examiner has been requested or appointed in this case.

4. On July 7, 2011, the Debtors filed the Debtors' Motion to Authorize and Approve (i) the Sale of Substantially All of Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (ii) the Assumption and/or Assignment of Certain Executory Contracts; and (iii) Establishing Related Cure Amounts (the "Sale Motion") and the Motion of the Debtors for an Order (i) Approving Sale Procedures for the Sale of Substantially All of the Assets of the Debtors, (ii) Approving Certain Bid Protections, (iii) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, and (iv) Scheduling an Auction and Sale Hearing (the "Sale Procedures Motion"). The Debtors intend to distribute to their creditors the proceeds from the proposed sale of substantially all of the assets of November 2005 (the "All-Asset Sale") to BOH Park Highlands NV, L.P. ("Purchaser" or "BOH") or the successful bidder at auction pursuant to the procedures requested in the Sale Procedures Motion and the Sale Motion.

5. On July 28, 2011, Wilmington Trust National Association ("Wilmington Trust"), in its capacities as administrative agent and collateral agent (the "First Lien Agent"), on behalf of itself and the first lien lenders (the "First Lien Lenders") filed an objection to the Sale Procedures Motion (Docket No. 63).[3] On the same date, Credit Suisse Loan Funding LLC ("Credit Suisse"), in its capacity as a first lien lender and a second lien lender, filed a joinder to the Objection (Docket No. 66) (the "Joinder").

### IV.    RESPONSE TO OBJECTION

6. By way of background, November 2005 defaulted on its debt obligations shortly after it emerged from Chapter 11 bankruptcy protection in 2009. Post-default, the Debtors' former equity interest holders refused to contribute any new capital and were prepared to walk

---

[3] Wilmington Trust is also the administrative and collateral agent for the second lien lenders; however, Wilmington Trust did not file an objection on behalf of the second lien lenders.

4

away from any further participation in the Park Highlands Project. The Debtors' lenders did nothing to address the default for more than a year. As a result, the entire Park Highlands Project sat in limbo post-default.

7. When November 2005 and other developers initially began the Park Highlands Project in 2005, they entered into the Development Agreement with the City of North Las Vegas. At that time, the market for residential real estate developments in the area was running at a fevered pitch. As a result, the City of North Las Vegas was able to negotiate and impose on November 2005 a number of onerous obligations through the Development Agreement. The Development Agreement was filed of record in the Clarke County Real Property Records prior to the filing of the First Lien Lenders' deeds of trusts and operates as a covenant running with the land. As such, any owner of the Real Property will be bound by the Development Agreement.

8. Since 2005, the residential real estate market in the area surrounding Las Vegas has declined dramatically. The obligations under the Development Agreement, which were consistent with the market in 2005, are now grossly out of market. Indeed, the Development Agreement would require the owner of the Real Property to expend well over $260 million for master infrastructure, common areas and public service facilities over the next few years simply to fulfill the development plan for the Park Highlands Project (the $260 million of costs represents the cost to develop super-pads, it does not include the cost to develop single-family residential lots within those super-pads). The scope of such obligations, when factored into a future cash flow model for the development of the Park Highlands Project, reveals a negative present value of future cash flows for the Real Property.

9. In light of the burdens imposed by the Development Agreement, any future Development of the Park Highlands Project will undoubtedly require a renegotiation of the Development Agreement with the City of North Las Vegas. Unfortunately, any future owner of the Real Property cannot be assured of obtaining any concessions from the City of North Las Vegas prior to acquiring ownership of the Real Property. That dilemma is further complicated

5

by the fact that any renegotiation of the Development Agreement will require the cooperation and consent of the other owners of property within the Park Highlands Project, including BOH, the proposed stalking horse bidder, who owns contiguous parcels within the Park Highlands Project.

10. In an attempt to restructure November 2005's debt so that the Park Highlands Project could move forward, an affiliate of BOH, BOPH, Inc. ("BOPH"), acquired NLV Holding Company, LLC ("NLV") in December 2010 for nominal consideration.

11. In March 2011, approximately half of the First Lien Lenders (the "Group of First Lien Lenders") notified the Debtors that they would not support any restructuring and demanded that the Real Property be promptly sold. Otherwise, the Group of First Lien Lenders stated that they would file an involuntary Chapter 7 proceeding against the Debtors. This stated position made any restructuring impossible.

12. After receiving the ultimatum from the Group of First Lien Lenders, in March 2011, the Debtors engaged Odyssey Capital Group, LLC ("Odyssey") to advise them on restructuring alternatives. The Debtors determined that a robust sale process was the best way to maximize value for creditors. The Debtors, therefore, proceeded forward with a sale of substantially all of their assets utilizing a stalking horse bidder.

13. BOH, an affiliate of the Debtors, is the most logical party to act as the stalking horse bidder because of its ownership of contiguous parcels in the Park Highlands Project and the need for cooperation amongst the owners in the Park Highlands Project to renegotiate the Development Agreement. The Debtors would prefer to have a stalking horse bidder with a higher sales price and/or better terms. Despite the Debtors' active marketing process to date, however, no viable alternative stalking horse bidder has stepped forward.

14. The Debtors' current owners will not agree to advance more capital to cover carrying costs (insurance and taxes), or to pay further costs of a sale. If no acceptable arrangement for a sales process can be reached, the Debtors will have no other choice but to convert the cases to Chapter 7 and allow a trustee to liquidate the Real Property. The Debtors

6

believe the creditors will receive greater value through the proposed sale than in a Chapter 7 liquidation.

### A. Neither the First Lien Agent nor its Lender-Participants Should be Surprised by these Cases or the Relief Requested by the Debtors.

15. The First Lien Agent suggests that the Debtors' bankruptcy filing came as a "surprise" to the lenders. It is difficult to imagine how the First Lien Agent, who is responsible for administration of a $130 million debt facility that has been in default for over a year by a borrower with no source of income and virtually zero cash, could possibly be surprised by the bankruptcy filing. This is particularly true when a large group of the First Lien Agent's own participants openly discussed the possibility of commencing an involuntary bankruptcy filing against the Debtors.

16. Moreover, the Debtors were in communication with the First Lien Agent in the weeks leading up to the Petition Date. In mid-June, the Debtors delivered to the First Lien Agent a summary of the Debtors' financial situation that contained significant detail regarding the proposed Chapter 11 filing and the proposed sale with BOH serving as stalking horse. On June 22, 2011 the CRO of the Debtors and counsel for BOH participated in an all-lender call to discuss the strategic reasons for the bankruptcy filing, the proposed Stalking Horse bid by BOH, the marketing process, and the bankruptcy exit strategy. Subsequently, counsel for the First Lien Agent and counsel for certain of the participating lenders participated in follow-up discussions with counsel for BOH regarding such issues.

17. Despite the suggestion by the First Lien Agent that the absence of a consensus among the Debtors and their secured lenders prior to commencement of these cases is "unusual"[4] the divergent points of view of the various participating lenders led the Debtors to conclude that no consensus would be reached prior to filing. The Debtors hope that the First Lien Agent and its constituents will continue to participate in the dialogue that the Debtors

---

[4] The Debtors submit that, although pre-negotiated bankruptcy cases are not uncommon in today's bankruptcy practice, they are not so prevalent they have become the norm.

7

commenced pre-petition and that further disputes regarding the sales process may be resolved on a consensual basis. However, the Debtors also understand that the First Lien Agent may not be able to deliver a sufficient majority of lenders either supporting or objecting to the sale and therefore must proceed as outlined in the Sales Procedure Motion to maximize value for the Debtors' estates.

### B. The Stalking Horse Bidder is Entitled to $3.2M+ Either through Credit Bid or Payment at Closing

18. The obligations to fund of the infrastructure costs for the development of Park Highlands are divided between BOH and November 2005 pursuant to the Infrastructure Funding Agreement between November 2005 and BOH's predecessor-in-interest, DRHI, Inc. ("DRHI"), dated March 1, 2006 (the "IFA"). Pursuant to the IFA, BOH is entitled to a claim against November 2005 for reimbursement of DRHI's overfunding of infrastructure costs during the early stages of development of the Park Highlands Project (the "Infrastructure Reimbursement Claim"). The current amount of the Infrastructure Reimbursement Claim as prorated to the Real Property is approximately $3.2 million.

19. While the IFA is not recorded, November 2005's obligation to repay the Infrastructure Reimbursement Claim is reflected in the Clarke County Real Property Records by the recorded Conditional Repayment and Funding Agreement between November 2005 and DRHI dated May 9, 2006 (the "CRFA"). The CRFA was recorded against the Real Property owned by November 2005 prior to the recordation of the first lien and second lien debt. Indeed, the CRFA is listed as an exception to the mortgagee title policies obtained by Novembers 2005's lenders.

20. The CRFA also constitutes a covenant running with the land and cannot be rejected under 11 U.S.C. § 365 or otherwise discharged under 11 U.S.C. § 363 with BOH's consent. *Silverman v. Ankari* (*In re Oyster Bay Cove, Ltd.*), 196 B.R. 251, 255 (Bankr. E.D.N.Y. 1996) (holding a sale under 11 U.S.C. § 363 does not impact restrictions of record that run with the land); *Gouveia v. Tazbir*, 37 F.3d 295, 299-301 (7th Cir. 1994) (finding covenants

running with the land create interests in property that prevent the trustee from selling the property "free and clear"); *In re Dundee Equity Corp.*, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. March 6, 1992) (holding 11 U.S.C. § 363 does not permit the sale of property free and clear of a restrictive covenant). Any sophisticated bidder on the Real Property will require that the obligations under the CRFA be removed from the Real Property as a condition to closing.

21. The First Lien Agent apparently disagrees with the Debtors' conclusion that BOH may credit bid the amount of the Infrastructure Reimbursement Claim. The First Lien Agent's focus on the technicalities of the IFA unnecessarily elevates form over substance. Either (i) BOH is entitled to credit bid the amount of the Infrastructure Reimbursement Claim, and BOH's cash portion of its purchase price will be reduced accordingly or (ii) BOH is not entitled to credit bid, but has a $3.2 million claim that must be satisfied at closing from the proceeds of the sale of the Real Property. In either scenario, $3.2 million of value must be provided to BOH.

22. In any event, the Debtors submit that these issues can and should be deferred to the hearing on the Sale Motion, as it will not effect the marketing process or submission of bids by third parties and will likely be rendered moot by virtue of the fact that no sophisticated buyer will acquire the Real Property subject to the CRFA.

**C.     The Proposed Sales Procedures will Maximize Value to the Estate**

23. The appropriateness of the procedures put in place to maximize value to the Debtors' estates is a valid exercise of the Debtors' business judgment. *See, e.g., Integrated Resources*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"). The sale process contemplated by the Sale Procedures Motion will provide the maximum recovery for the estates' creditors. The proposed procedures establish an extremely low barrier for entry by competing bidders and provide sufficient time for bidders to review the fairly simple financial and business structure of the Debtors.

24. Odyssey[5] has been actively marketing the Real Property since before the Petition Date. Odyssey has contacted approximately 250 potential strategic and financial buyers for the Real Property, and three other bidders have signed non-disclosure agreements and are engaged in due diligence process through the review of materials placed by Odyssey in the Debtors' online data room.

25. The Debtors selected BOH as stalking horse due to the fact that (i) BOH was willing to make a stalking horse bid of 80% of the appraised value of the Real Property despite the fact that the appraised value ignores the obligations under the Development Agreement, which would otherwise render the Real Property worthless and (ii) BOH is in a unique position as the owner of adjacent parcels in the Park Highlands Project to negotiate with the City of North Las Vegas for modifications to the Development Agreement. The Debtors did not believe a protracted search for an alternative stalking horse would benefit the Debtors' estates because such search would delay the filing and would likely not unearth another suitor who would bid more than BOH. Nevertheless, if another party emerges with a superior stalking horse offer prior to the hearing on the Sales Procedures Motion, the Debtors are free to substitute the new bidder for the Stalking Horse bidder and amend the Sales Procedure Motion accordingly. *See* Stalking Horse Agreement § 12(d).

26. With respect to the proposed Break-Up Fee, the First Lien Agent cannot deny that it is within the Debtors' business judgment to determine how to structure their proposed bid protections to accomplish their goal of maximizing value for these estates. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. Here, the proposed Break-Up Fee is less than 2% of the Purchase Price, which is significantly lower than standard break-up fees in Chapter 11 cases.

---

[5]    The Debtors' will respond to the objections to Odyssey's retention by separate pleading.

10

27. The bid protections being sought will ensure the availability of a bid that could lead to a confirmable plan, and will not stifle bidding. *See, e.g., Integrated Resources,* 147 B.R. 650, 659-60 (S.D.N.Y. 1992) ("The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable. In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be necessary to discharge that directors' duties to maximize value."). Bid protections are routinely granted in cases, and it is likely that any stalking horse bidder would seek these same protections.

### D. The Stalking Horse Bidder is Entitled to Administrative Expense Reimbursement

28. The First Lien Agent asserts that Debtors are attempting to surcharge the lenders' collateral pursuant to Bankruptcy Code section 506(c). The Debtors currently have no significant cash or source of income to satisfy the administrative expenses of these cases, and the Debtors had no expectation of the ability to obtain debtor-in-possession financing. The Sales Procedures contemplate that, in order to fund the bankruptcy case and the sales process, the Stalking Horse Bidder will provide $300,000 to the Debtors to satisfy the Debtors' ongoing administrative expenses. Absent the Stalking Horse Bidder's willingness to front the $300,000, the Debtors would not be able to fund a sales process and would have filed Chapter 7. While the proposed arrangement effectively results in the surcharge of the lenders' collateral, there is no other practical alternative for the Debtors to proceed with a sales process in Chapter 11. The alternative, a Chapter 7 liquidation process, would not maximize recovery for the estates and delay the orderly disposition of the Real Property.

### E. Debtors Will Agree to A Reasonable Extension of the Marketing Process

29. The First Lien Agent requests that the Court extend the time to market the Real Property beyond the time period provided in the Sale Procedure Motion due to the purported complexity of the Debtors' assets. Although Debtors are dubious that any extension will yield higher recoveries for the creditors, Debtors and BOH are willing to agree to a two week extension of the proposed marketing process.

WHEREFORE, Debtors respectfully request that this Court enter an order (i) granting the Sale Procedures Motion; (ii) approving the proposed Stalking Horse Agreement as the stalking horse bid in connection with the auction contemplated in the Sale Procedures Motion and (iii) granting such other relief as is necessary or appropriate.

Dated this 3rd day of August, 2011

/s/ James D. Greene
James D. Greene, Esq., Nevada Bar No. 2647
GREENE INFUSO, LLP
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146
Telephone: 702.570.6000
Facsimile:  702.463.8401
Email: jgreene@greeneinfusolaw.com