James D. Greene, Esq., Nevada Bar No. 2647
**GREENE INFUSO, LLP**
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146
Telephone: 702.570.6000
Facsimile:  702.463.8401
Email: jgreene@greeneinfusolaw.com

*E-filed: September 19, 2011*

Attorneys for Debtors

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| IN RE:<br><br>NOVEMBER 2005 LAND INVESTORS LLC.,<br>et al.<br><br>Debtors<br><br>Affects:<br><br>☒    All Debtors<br><br>☐    Affects the following Debtor(s) | Bankruptcy No. BK-S-11-20704-MKN<br><br>Jointly Administered BK-S-11-20707-MKN, and BK- S-11-20709-MKN<br><br>Chapter 11<br><br>**Hearing Date: September 29, 2011**<br>**Hearing Time: 9:30 a.m.** |

**FIRST AMENDED MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING
SALE PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL
OF THE ASSETS OF THE DEBTORS, (II) APPROVING CERTAIN BID
PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF
NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND
<u>(IV) SCHEDULING AN AUCTION AND SALE HEARING</u>**

November 2005 Land Investors, L.L.C. ("<u>November 2005</u>"), NLV Holding, L.L.C. ("<u>NLV Holding</u>") and BOPH, Inc. ("<u>BOPH</u>") (collectively, the "<u>Debtors</u>"), as debtors-in-possession, hereby move the Court, pursuant to sections 105, 363, and 503 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, 9007, and 9014 of the Federal

1

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004(b) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Nevada (the "Local Rules") for entry of an order (the "Sale Procedures Order"):

    a.    approving proposed amended sale procedures (the "Sale Procedures"), attached hereto as **Exhibit A**, as well as proposed bid protections, in connection with the sale (the "Sale") of substantially all of the assets of November 2005 (the "Assets") as set forth in more detail in the Sale Contract (as defined below);[1]

    b.    scheduling an auction (the "Auction");

    c.    scheduling a final sale hearing (the "Sale Hearing") in connection with the Sale; and

    d.    approving the form and manner of notice of the Auction and the Sale Hearing, including the form and manner of service of the notice (the "Auction and Hearing Notice") attached hereto as **Exhibit B**, and the notice of the proposed assumption and assignment of executory contracts and unexpired leases in the form attached hereto as **Exhibit C** (the "Assumption and Assignment Notice").

## BACKGROUND

1. On July 6, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. An official committee of unsecured creditors has yet to be appointed in these Chapter 11 cases. Further, no trustee or examiner has been requested or appointed in any of these Chapter 11 cases.

**Events Leading to the Debtors' Bankruptcy Filing and the Proposed Sale**

---

[1] The Debtors reserve the right to file further revised proposed bid procedures to the extent agreed to betwwn and among the lenders.

3. November 2005 is a Nevada-based limited liability company formed on October 11, 2005 for the purpose of acquiring, together with DRHI, Inc. ("DRHI"), approximately 2,675 gross acres (1,947 net acres) located in North Las Vegas, Nevada (the "Property"). NLV Holding is the 100% owner of November 2005. BOPH is the 100% owner of NLV Holding.

4. On May 9, 2006, November 2005 and DRHI acquired the Property from the United States Bureau of Land Management. At the time, November 2005's sole member was Holding. Holding in turn, was owned by a consortium of four homebuilders.

5. November 2005 financed the acquisition of Park Highlands with first and second lien secured debt. November 2005's debt was to be repaid over time with proceeds from land sales to the Original Owners at predetermined prices according to a predetermined take down schedule. Concurrently with the acquisition of the Project, DRHI and November 2005 entered into a Development Agreement ("Development Agreement") with the City of North Las Vegas.

6. Due to a variety of factors including the global economic recession that began in late 2007, depressed residential housing markets and distress in global credit markets, demand for housing in the Las Vegas market declined dramatically. The negative effects of the foregoing on the Property were compounded by November 2005's significant debt load.

7. In 2008, BOH Park Highlands NV, L.P. ("BOH") purchased and was assigned all of DRHI's interests in and to the Property, including approximately 400 acres of real property and, among other things, all rights of DRHI under the Development Agreement.

8. Also in 2008, after securing multiple amendments, waivers, extensions and forbearance concessions from lenders, November 2005 attempted to execute an out-of-court restructuring with its first and second lien lenders. November 2005 failed to achieve unanimous consent from the lender groups with respect to the out-of-court restructuring plan. Unable to support its debt structure, November 2005 filed for Chapter 11 bankruptcy in May 2009 in the

United States Bankruptcy Court for the District of Nevada, Case No. 09-17474-MKN (the "2009 Bankruptcy").

9. As part of the 2009 Bankruptcy, November 2005 obtained confirmation of a chapter 11 Plan of Reorganization on November 4, 2009 (the "2009 Plan"). Pursuant to the 2009 Plan, approximately $8 million in new capital (in the form of a converted debtor-in-possession loan) was contributed into November 2005, and NLV Holding became the sole member of the reorganized debtor. In addition, the first and second lien debt on the Property was restructured, such that the Property was then encumbered by (i) first lien debt of $125 million and (ii) second lien debt of $55 million.[2]

10. Still laden with a significant debt load and under continued housing market stress, the reorganized November 2005 defaulted on interest payments within four months of emergence from chapter 11. The owners of November 2005 stopped funding infrastructure improvements and service obligations in 2010. As a result, for most of 2010, the Property sat idle with no development and no activity.

11. In December 2010, BOPH purchased 100% of the equity in NLV Holding (for nominal consideration) with the intention of restructuring November 2005's debt facilities so that the Development Agreement could be amended to implement a new cost sharing agreement to allocate Infrastructure Costs among all owners within the Project. BOPH is an affiliate of BOH.

12. During the period between the 2009 Bankruptcy and July 2011, certain parcels of the Real Property have been sold such that November 2005's current interest in the Real Property is 1,340 gross acres (approximately 1,000 net acres).

---

[2] In addition, pursuant to a certain refunding agreement, BOH has asserted a $3.2 million secured claim against the Property, the validity, priority and extent of which, has been disputed by the holders of the first lien debt.

13. Prior to the Petition Date, the Debtors and their professional advisors explored various out-of-court alternatives. In March 2011, the Debtors retained Odyssey Capital Group, LLC ("Odyssey") to assist with these efforts. Odyssey advised the Debtors that a restructuring (either in court or out-of-court) was not possible in light of, among other things, (i) the depressed value of the Property (as evidenced by a recent appraisal obtained by the Debtors); and (ii) the absence of any working capital available to the Debtors.

14. Following significant investigation, due diligence and negotiation with various parties and lenders, the Debtors in consultation with Odyssey, determined that seeking bankruptcy protection under Chapter 11 of the Bankruptcy Code and selling substantially all of their assets pursuant to the Bankruptcy Code was in the best interests of all parties in-interest. In that regard, the Debtors have retained Odyssey to act as financial advisors to the Debtors to run an organized, robust sales process for the assets. In addition, one of Odyssey's principals, Mr. Grant Lyon, has been appointed President and Chief Restructuring Officer of the Debtors to independently manage these Chapter 11 cases and the sale process.

15. On July 7, 2011, the Debtors filed their Motion of the Debtors for an Order Authorizing (I) the Sale of Substantially all of the Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, and (II) the Assumption and Assignment of Executory Contracts and Unexpired Leases [Docket No.18] (the "Sale Motion"). The Debtors intend to file an amended sale motion (the "Amended Sale Motion") in the near term.

16. In the weeks leading up to this Chapter 11 filing, Odyssey initiated discussions with BOH regarding the possibility of BOH acting as the stalking horse bidder for a sale of substantially all of November's assets in Chapter 11 proceedings. Despite the Debtors' agreement with BOH to serve as the stalking horse bidder, the prepetition lenders objected to

the proposed stalking horse agreement. As a result, the Debtors terminated the proposed stalking horse agreement and consequently now file this motion (the "Amended Sale Procedures Motion") to establish procedures to sell substantially all of their assets in an open and free auction process, potentially in a form to be similar to the form Contract of Sale ( as such may be amended, modified or reconstituted, "Sale Contract") attached hereto as ***Exhibit D***.[3] The Debtors contemplated the distribution of the proceeds from the sale contemplated herein will be distributed pursuant to a court order approving the Amended Sale Motion.

17. The Debtors believe that a sale based on the Sale Procedures proposed herein provides the best opportunity for maximizing value for the Debtors' creditors.

**Relief Requested**

18. By the Amended Sale Procedures Motion, the Debtors seek, pursuant to sections 105, 363, 365 and 503 of the Bankruptcy Code, entry of the Sale Procedures Order:

(a) approving (i) the Debtors' proposed Sale Procedures for marketing the Assets, which procedures are attached hereto as Exhibit A;

(b) establishing December 9, 2011 at 5:00 p.m. (Pacific Time) as the deadline for the submission of bids (the "Bid Deadline");

(c) scheduling the Auction, if necessary, no later than December 14, 2011 at 9:30 a.m. (Pacific Time);[4] and

(d) scheduling the Sale Hearing for a date convenient to the Court, preferably within two business days after the Auction to consider the sale of the Debtors' Assets to the party that is the successful bidder at the Auction.

---

[3] Certain aspects of the proposed form of sale contract are still being revised. The proposed form of contract will be filed as a supplement to this motion.

[4] The Debtors and the Lenders may alter their deadline requests depending upon continuing discussions and the Court's preferences and calendar.

*The Proposed Sale Procedures*

19. The Debtors are requesting that the Court approve the Sale Procedures for the sale of the Assets.[5] The following is a summary of the Debtors' proposed Sale Procedures.[6]

a. Participation in the bidding process and access to the Debtors' due diligence data room will require (i) an executed confidentiality agreement in form and substance satisfactory to the Debtors, after consultation with the First Lien Parties; and (ii) a statement demonstrating to the Debtors' satisfaction, after consultation with the First Lien Parties; a *bona fide* interest in purchasing, and the financial ability to purchase, the assets of the Debtors. Each person or entity that delivers such materials to the Debtors on or before the Bid Deadline in form reasonably acceptable to the Debtors and the First Lien Parties is hereinafter referred to as a "Potential Bidder".

b. Any Potential Bidder that desires to make a bid shall deliver copies of its bid by facsimile and email to (a) Grant Lyon, proposed Chief Restructuring Officer of the Debtors (the "CRO"), Odyssey Capital Group, LLC, One Renaissance Square, Two North Central Ave., Suite 720 Phoenix, AZ 85004, and (b) counsel to the Debtors, Greene Infuso, LLP, 3030 South Jones Blvd., Suite 101, Las Vegas, NV 89146 (Attn: James D. Greene), and (c) counsel to Wilmington Trust, the agent for the Debtors' prepetition lenders, Orrick, Herrington & Sutcliffe LLP, 51 West 52nd Street, New York, NY 10019-6142 (Attn: Raniero D'Aversa).

c. All bids must provide for or include:

(i) an all-cash, non-contingent offer to acquire the Assets in the form of the Sale Contract, marked to show any proposed amendments and modifications to such agreement, including any Assumed Contracts (the "Marked Agreement") that is binding and irrevocable until 48 hours after the earlier of (a) the closing of the sale of the Assets, (b) the withdrawal of the Assets for sale by the Debtors or (c) 30 days after the Sale Hearing;

(ii) a certified check or wire transfer in an amount equal to 5% of the cash purchase price set forth in the Marked Agreement payable to the order of the Debtors (a "Good Faith Deposit")[7] and written

---

[5] The proposed form of Sale Procedures Order contains dates proposed by the Debtors. These dates are subject to the availability and approval of the Court and may change.

[6] The summary contained herein is qualified by the actual Sale Procedures attached hereto as Exhibit A. In the event of any conflict between the summary and the Sale Procedures, the Sale Procedures shall control.

[7] To the extent the Debtors' prepetition secured lenders (the "Lenders") wish to make a credit bid, the Lenders will not be required to make a Good Faith Deposit or provide written evidence of available cash.

7

evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder (as defined below) (provided, however, that the closing of the Sale shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction as the Debtors, in consultation with the First Lien Parties, may reasonably request; and

(iii) that the bid is not subject to any due diligence, financing condition or other contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to purchase the Assets other than as may be included in the Sale Contract.

20. Bidders that have submitted Qualified Bids (as defined in the Sale Procedures) will be eligible to participate at the Auction described below. At least one business day prior to the Auction, each Potential Bidder that has submitted a Qualified Bid must inform the Debtors and the First Lien Agent whether it intends to participate in the Auction. The Debtors will promptly thereafter inform in writing each Potential Bidder that has expressed its intent to participate in the Auction of the identity of all other Potential Bidders that may participate in the Auction. If the Debtors do not receive any Qualified Bids, they will not hold an Auction.

21. If at least one Qualified Bid is received by the Bid Deadline, the Debtors will conduct the Auction for the sale of the Assets. The Debtors propose that the Auction take place at 9:30 a.m. (Pacific Time) on or about December 14, 2011 at the offices of counsel for the Debtors, Greene Infuso, LLP, 3030 South Jones Blvd., Suite 101, Las Vegas, NV 89146 (Attn: James D. Greene), or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders. The bidding shall start at the amount offered in the highest Qualifying Bid, plus $100,000 and will continue in increments of at least $100,000 in cash until the bidding ceases. The Lenders will be entitled to credit bid, dollar for dollar, any portion of their secured claims against the Debtors. The Debtors, in consultation with the First

Lien Parties, may alter the Sale Procedures at the Auction if, in their reasonable judgment, such alteration will better promote the goals of the Auction. Immediately prior to the conclusion of the Auction, the Debtors, (a) review each bid made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; (b) determine the highest or best bid for the Assets of the Debtors at the Auction (the "Successful Bid"); and (c) notify all Potential Bidders at the Auction, prior to its conclusion, of the name of the maker of the Successful Bid (the "Successful Bidder"). All bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale of the Assets and the construction and enforcement of the Sale Contract. After determining the Successful Bid, the Debtors, in consultation with the First Lien Parties, may determine, in their reasonable business judgment, which Qualified Bid is the next best bid (the "Next Best Bid").

22. The Debtors, in consultation with the First Lien Parties, may reject at any time before entry of the Sale Order any bid, that, in the Debtors' reasonable judgment, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Sale Procedures or the terms and conditions of the Sale or (c) contrary to the best interests of the Debtors and their estates. Subject to the approval of the Court, the Debtors will sell the Assets to the Qualified Bidder that submits the Successful Bid. The Debtors' presentation to this Court for approval of the selected bid as the Successful Bid does not constitute the Debtors' acceptance of the bid. The Debtors, in consultation with the First Lien Parties, will have accepted a Qualified Bid only when such Qualified Bid has been approved by the Court at the Sale Hearing. If the Successful Bidder does not close the Sale by the date agreed to by the

Debtors and the Successful Bidder, then the Debtors, in consultation with the First Lien Parties, shall be authorized, but not required, to close with the party that submitted the Next Best Bid (the "Next Best Bidder"), without a further court order. The Debtors acknowledge that with respect to any Qualified Bidder, unless the Marked Agreement submitted by such Qualified Bidder pursuant to the Sale Procedures alters the Sale Contract or such Marked Agreement is modified as a result of actions taken by such Qualified Bidder at the Auction, such Qualified Bidder shall have no obligation to serve as the Next Best Bidder. The Debtors, in consultation with the First Lien Parties, may consider a Qualified Bidder's willingness to serve as the Next Best Bidder in determining the highest or best bid for the Assets at the Auction.

23. Potential Bidders or Qualified Bidders shall not be allowed any breakup, termination or similar fee. Moreover, neither the tendering of a bid nor the determination that a bid is a Qualified Bid shall entitle a Potential Bidder or Qualified Bidder to any breakup, termination or similar fee and all Potential Bidders and Qualified Bidders waive any right to seek a claim for substantial contribution.

24. The Good Faith Deposits of all Potential Bidders shall be held in escrow by the Debtors, but shall not become property of the Debtors' estates. The Good Faith Deposits of all Potential Bidders shall be retained by the Debtors, notwithstanding Bankruptcy Court approval of a sale, until 48 hours after the earlier of (a) closing of the Sale, (b) withdrawal of the Assets for sale by the Debtors, and (c) 30 days after the Sale Hearing. At the closing of the Sale contemplated by the Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit.

25. In all aspects of their conduct of the sale process described herein, including the Auction, the Debtors shall use their reasonable best efforts to provide information to, and to

consult with, the First Lien Parties and their representatives. Notwithstanding the foregoing, the Debtors shall use their independent business judgment in their conduct of the sale process and the Auction. The Debtors believe that the proposed Sale Procedures provide an appropriate framework for selling the Assets and will enable the Debtors to review, analyze and compare all bids received to determine which bid is in the best interests of the Debtors' estates and creditors.

### *Proposed Notice of the Sale Hearing*

26. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 20 days' notice sale of any estate property. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested in the Amended Sale Motion as it relates to the Sale. The Debtors will propose a deadline for objecting to approval of the proposed Sale be set at an appropriate time based upon the date of the Sale Hearing (the "Objection Deadline").

27. Within two business days after entry of the Sale Procedures Order the Debtors will serve the Auction and Hearing Notice by first-class mail, postage prepaid upon the following parties: (a) the Office of the United States Trustee for the District of Nevada; (b) counsel to Wilmington Trust, the agent for the Debtors' prepetition lenders; (c) the Debtors' twenty largest unsecured creditors, as identified in the Debtors' chapter 11 petitions; (d) all parties that are known to claim interests in or liens upon Debtors' assets; (e) all parties to the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (collectively, the "Assumed and Assigned Agreements"); (f) the Texas and Nevada state attorneys general; (g) applicable taxing authorities, including the Clark County Treasurer, the State of Nevada and the Internal Revenue Service; (h) all entities

requesting service in these cases; and (i) all other known potential creditors in these chapter 11 cases. The Auction and Hearing Notice shall indicate that the Sale Procedures and the Sale Contract can be obtained without charge from counsel for the Debtors. In addition, the Debtors will serve the Amended Sale Procedures Motion, including a copy of the Sale Contract (without schedules or exhibits), on those persons in categories (a) through (i), above. Further, within two business days after entry of the Sale Procedures Order, or as soon as practicable thereafter, the Debtors will place a publication version of the Auction and Hearing Notice for one day in the Las Vegas Review Journal and the Nevada Legal News.

28. The Auction and Hearing Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Amended Sale Motion once they are set by the Court, and, will therefore, comply with Bankruptcy Rule 2002(c). The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Assets. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

*The Proposed Notice of the Assumption and Assignment of Executory Contracts and Unexpired Leases*

29. Additionally, the Debtors, as part of the Sale, intend to assume and assign only one executory contract, the Development Agreement, pursuant to which there are no existing defaults. A Bidder shall indicate any additional executory contracts or unexpired leases it intends to assume and have assigned by the Debtors in its modifications to the Sale Contract (Schedule 1).

30. As soon as practicable, but no later than thirty (30) days prior to the Sale Hearing, the Debtors will file a schedule of cure obligations (the "Cure Schedule") for the

Assumed and Assigned Agreements. The Debtors will file a supplement to the Cure Schedule (the "Supplemental Cure Schedule") within one (1) day following the Auction to identify executory contracts which will be assumed and assigned to the Successful Bidder upon closing of the Sale. The Cure Schedule and the Supplemental Cure Schedule will include a description of each Assumed and Assignment Agreement potentially to be assumed and assigned under the Sale Contract or other agreement with the Successful Bidder and the amount, if any, the Debtors believe is necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Amounts"). A copy of the Cure Schedule and the Supplemental Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the nondebtor parties listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Court. Any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, objections relating to adequate assurance of future performance or to the Cure Amounts set forth on such schedule, must be in writing, filed with the Court, and be actually received on or before a date set by the Court, by (a) Grant Lyon, proposed Chief Restructuring Officer of the Debtors (the "CRO"), Odyssey Capital Group, LLC, One Renaissance Square, Two North Central Ave., Suite 720 Phoenix, AZ 85004; (b) counsel to the Debtors, Greene Infuso, LLP, 3030 South Jones Blvd., Suite 101, Las Vegas, NV 89146 (Attn: James D. Greene); and (c) counsel to the First Lien Agent, Orrick Herrington & Sutcliffe LLP 51 West 52nd Street, New York, New York 10019-6142 (collectively, the "Notice Parties"); provided, however, that in the event the Auction results in a Successful Bidder, the deadline for objecting to the assignment of the Assumed and Assigned Agreements to such Successful Bidder on the basis of adequate assurance of future performance will be the commencement of the Sale Hearing. Any objection

to the Cure Amounts shall set forth the specific default or defaults in any Assumed and Assigned Agreements and set forth the specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Schedule.

31. If no objections are received, then the Cure Amounts set forth in the Cure Schedule will be binding upon the nondebtor parties to the Assumed and Assigned Agreements for all purposes in these chapter 11 cases and otherwise, and will constitute a final determination of the total Cure Amounts required to be paid by the Debtors in connection with the assumption and assignment of the Assumed and Assigned Agreements. In addition, all counterparties to the Assumed and Assigned Agreements will (a) be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtors and the Successful Bidder will be entitled to rely solely upon the Cure Amounts set forth in the Cure Schedule; (b) be deemed to have consented to the assumption and assignment, and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

32. Where a nondebtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Amounts (the "<u>Disputed Cure Amount</u>"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the Successful Bidder's consent to such resolution, the Debtors shall promptly provide any parties in interest notice and an opportunity to object to such proposed resolution or (b) to the extent the parties are unable to

consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing or at such other date and time as may be fixed by this Court. All other objections to the proposed assumption and assignment of Assumed and Assigned Agreements will be heard at the Sale Hearing. The Debtors intend to cooperate with counterparties to Assumed and Assigned Agreements to attempt to reconcile any differences in a particular cure amount.

33. The Debtors request that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code. See Futuresource, LLC v. Reuters Ltd., 312 F.3d 281, 285 (7th Cir. 2002) (by not objecting to sale motion, creditor deemed to consent); Veltman v. Whetzal, 93 F.3d 517, 521 n.5 (8th Cir. 1996) (same); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same); see also In re Texas Rangers Baseball Partners, Amended and Restated Findings of Fact and Conclusions of Law with Respect to the Confirmation Order, Case No. 10-43400 at *33-34 (Bankr. N.D. Tex. October 12, 2010) (finding that parties who failed to object to the treatment or cure amounts are deemed to have consented to such treatment under section 365). Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

34. Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Nevada; (b) the Debtors' 20 largest unsecured creditors, as identified in the Debtors' chapter 11 petitions; (c) counsel to Wilmington Trust, the agent for the Debtors'

15

prepetition lenders; (d) all parties that have filed requests for notice under Bankruptcy Rule 2002; and (e) all parties to the Assumed and Assignment Agreements. In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter the Sale Procedures Order granting (i) the relief requested herein, and (ii) such other and further relief to the Debtors as the Court may deem proper.

Dated this 19th day of September, 2011

By: James D. Greene
James D. Greene
GREENE INFUSO, LLP
3030 South Jones Boulevard
Suite 101
Las Vegas, NV 89146
Attorneys for Debtors